839 So.2d 1277 (2003)
Gary D. HOWARD, Plaintiff-Appellant,
v.
HOLYFIELD CONSTRUCTION, INC., Defendant-Appellee.
No. 36,734-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 18, 2003.
*1278 McBride & Collier, by Robert M. Hanna, Alexandria, for Appellant.
Crawford & Anzelmo, by Donald J. Anzelmo, Monroe, for Appellee.
Before BROWN, WILLIAMS, GASKINS, DREW and KOSTELKA (Pro Tempore), JJ.
DREW, J.
Gary Howard appeals from a judgment of the Office of Workers' Compensation *1279 terminating his right to compensation benefits. For the following reasons, we reverse the judgment in part, affirm the judgment in part, and remand.

FACTS
In this workers' compensation case, the issues are whether the workers' compensation judge ("WCJ") erred in finding that the claimant made false statements to obtain compensation, whether the WCJ considered inadmissible evidence, whether the employer falsified a job description and whether the employer is liable for alleged violations of the doctor-patient privilege.
Claimant, Gary Howard, is a carpenter, formerly employed with Holyfield Construction, Inc. ("HCI"). HCI's compensation carrier is Louisiana United Businesses Association Self Insurers Fund ("LUBA"). On February 7, 2000, Howard fell from a ladder while working and broke his right wrist. Howard is right-handed. Thereafter, HCI paid Howard weekly compensation benefits and medical benefits.
Dr. Sidney Bailey, an orthopedist, diagnosed the wrist fracture, and a splint was applied. He believed there would be total temporary impairment of 8 to 12 weeks, with little to no permanent impairment expected. Once Howard finished his pain medication and was able to drive, he would be permitted to return to a sedentary or light job that did not require use of his right hand. Dr. Bailey recommended a long-arm cast on February 16, 2000. The long-arm cast was replaced with a short-arm cast the next month. On April 13, 2000, X-rays showed "near anatomic healing and alignment." Dr. Bailey recommended an immobilizer. Six days later, X-rays showed there was not a solid union of the fractured bone. The immobilizer was discontinued and a short arm cast was used. On May 4, 2000, Dr. Bailey noted healing of the distal radius fracture. He recommended outpatient therapy and light duty. Howard complained of discomfort in his right wrist when examined by Dr. Bailey on May 25, 2000, and Dr. Bailey recommended that therapy be continued.
In a progress report dated June 29, 2000, Dr. Bailey stated that he had reviewed studies consistent with bilateral carpal tunnel syndrome. He noted that Howard had prior "nerve injuries to the left, but none to the right," and he recognized that the carpal tunnel problems might be part of the symptom complex. Dr. Bailey recommended a resting night splint and stated that if there was no improvement, he would consider a carpal tunnel release.
A function capacity evaluation ("FCE") ordered by Dr. Bailey was performed in July 2000. The FCE report stated that Howard gave "reliable efforts" during testing, and the results suggested an "actual and true functional capacity." During the work simulation portion of the FCE, Howard was tested swinging an eight-pound sledgehammer, screwing and unscrewing wood screws with a drill and a hand-held screwdriver, nailing and removing various sized nails, and assembling nuts and bolts into a panel. The work simulation was to last for 45 minutes or until either the evaluator or the patient terminated it; Howard terminated it after 35 minutes.
The FCE evaluator, Debi Balch, observed that Howard "experienced difficulty using the right hand/wrist during activities that required extreme AROM [Active Range of Motion] in all planes, more so ulnar deviation." She also noted that Howard "experience[d] increased discomfort with forceful, downward resistance coupled with supination/pronation, as with *1280 use of the drill and screwdriver and with swinging a sledge hammer." The evaluator stated that Howard could return to limited-duty work with weight restrictions and a graduated return to full-duty work.
Howard briefly attempted to return to work with HCI after this first FCE, but testified that he was unable to do the kind of work required. His first assignment was a welding job, but he found the grinder to be too heavy. His next assignment was to tear forms from a new concrete sidewalk using an eight-foot long crowbar and a shovel. A third task was to drive iron rods measuring 12 to 18 inches into the ground with a four-pound sledgehammer. These rods were used to hold steel mesh for forming concrete. Howard testified that it hurt his hand to pry with the crowbar, which weighed between 15 and 20 pounds. His last assignment was to put plaster on a house, which he was unable to do because it involved working high above the ground. When he refused to do the last assignment, he was told to go home.
Dr. Bailey noted on August 9, 2000, that Howard complained of hypesthesias in the median nerve distribution of the right hand after returning to work, which was shown by a physical exam. His diagnosis was probable carpal tunnel syndrome. Nerve Conduction Velocity ("NCV") tests and a resting night splint were recommended.
An NCV test was performed on August 16, 2000. The test suggested right median neuropathy at the forearm which may have been secondary from trauma. Dr. Bailey noted no improvement from the splint on August 22, 2000. An EMG/NCV performed on August 30, 2000, indicated traumatic neuropathy of the right median nerve at 6.5 cm above the distal wrist crease. After reviewing the results of the EMG/NCV tests, Dr. Bailey recommended exploration and release of Howard's median nerve and forearm.
A median neurolysis was performed on Howard's right forearm and wrist on September 27, 2000. Dr. Bailey noted that he expected total temporary impairment of four to six weeks with minimal, if any, permanent impairment. Outpatient therapy was ordered following the surgery. A progress note from November 28, 2000, reflected that Howard related that his condition improved when he was at rest, but the symptoms increased when he used his hand. Howard complained of no improvement on January 4, 2001.
An EMG/NCV was performed on January 9, 2001. The results suggested "a limited degree of right median nerve involvement at the wrist (i.e., right carpal tunnel syndrome with borderline prolongation of the right median nerve motor and sensory latencies)." There was no clear indication of median nerve involvement in the right forearm proximal to the wrist. Dr. Bailey reviewed the results and stated that he would not recommend exploration.
On January 25, 2001, Howard underwent a second FCE. Howard complained of "moderate to severe pain in wrist/forearm with static and dynamic lifting/carrying, pushing/pulling, crawling, and mild with tool use." The FCE report concluded:
... [Howard was] capable of performing light to medium work with lifting tasks; fine motor manipulation speed and discrimination of objects is also limited with right hand. It appears that symptoms has (sic) increased since initial FCE which is decreasing level of function more.
On February 15, 2001, Dr. Bailey issued a progress report in which he stated:

*1281 Agree with FCE, i.e., light to medium duty. He has another opinion with Dr. Springmeir (sic), I appreciate his input, and we will see him one more time after about 4-6 weeks. It is okay to return to light-medium duty as of today's date.
Howard was examined by Dr. Craig Springmeyer on April 16, 2001. Dr. Springmeyer stated that he thought that "due to the type of work [Howard] has and the type of injury he had, he may continue to have wrist problems along with some chronic neuropathy." He added that if that was correct, then Howard would probably need retraining for a more sedentary type of job.
On April 24, 2001, Dr. Bailey released Howard from his care and in his report again noted his agreement with the results of the FCE. On May 2, 2001, a disability evaluator, Debi Balch, assigned Howard a whole person impairment rating of 19%. On May 10, 2001, with the assistance of the employer, a job description was prepared for Howard. This description stated:
General description of job:
Generally light to medium carpentry work, lift a material with assistance if needed (his decision). Sawing, nailing occasionally. Measuring and installing doors. All general light to medium duty carpentry work.
Can this job be modified? Yes/No. If so, how?
This position has been modified to assist Mr. Howard. He can decide if items are too heavy and refuse to lift them without problem unless he is continuously unable to perform light to medium work.
The emphasized term above is circled on the original document. Dr. Bailey approved of this description on May 30, 2001.
Howard returned to work on June 11, 2001, but said that he was only able to work for about two hours. He was assisting in the demolition of some walls. Howard stated that he began by removing the crown molding, using a flat bar about a foot long to pry away the crown molding. He then used the flat bar and a claw hammer to remove door trim, describing the process as using the hammer to knock the flat bar underneath the trim, and then twisting the flat bar to pry the trim. Howard next attempted to remove the baseboard. Spanish tile had been laid down after the baseboard was put in, so it was difficult to remove the baseboard without breaking the tile. Howard recalled that the flat bar twisted in his right hand as he tried to remove a section of baseboard, and his hand began hurting. He attempted to continue working because his doctor told him to expect some pain and try to endure it, but the pain increased until it became too great.
Joe Holyfield, Howard's employer, testified that he released Howard from work that day because Howard complained that he was having pain in his arm, and that it was Howard's decision that he could not do the work and that Howard said that he could not remove trimwork. Holyfield testified that Howard was removing the trim when he walked up, although he did not know what tools Howard was using as he was not acting as job supervisor. In any event, Holyfield estimated that Howard had been working, on that date, for two hours. Howard testified that when he complained about his hand hurting, Holyfield told him that was the only job he had for him that day, so he might as well go home. Holyfield testified that removing trim was light work for a carpenter and that Howard said that he could not do this. Howard characterized his tasks that day *1282 as heavy work, and he considered his work as a finishing carpenter to be lighter work than what he was doing to remove the wall. HCI terminated Howard's compensation benefits on June 11, 2001.
Holyfield testified that Howard continued to come into work for several mornings and "sit around [and] drink coffee and talk to some of the employees" and that he repeatedly told Howard, "If you can't do the job, go home." Howard said that he came into HCI's office every morning for two and a half months and that his offers to work were rejected by Holyfield.
On June 26, 2001, Howard returned to Dr. Bailey. Dr. Bailey's report from that date stated in part:
He attempted to return to work, but states that he had to do a lot of activities regarding twisting, turning and using his types of tools that he was unable to do without pain.
PHYSICAL EXAMINATION: Actual improvement with lesser traction and visible adhesions in the forearm with active and passive range of motion of the right hand which is full sensation.
He has some pain in the thumb and index distribution, but no hypesthesias.
Impairment and restrictions as before. We discussed this at length. He's had an FCE, permanent impairment rating and a job analysis that I signed off on....
* * *
Again, I believe if he would continue to attempt to use the hand and forearm despite subjective complaints of pain, then I believe his symptoms will hopefully improve over a period of time.
During the course of Howard's disputed claim, his activities were videotaped on several occasions by Robert DeFatta, a private investigator. DeFatta provided two VHS-format videotapes which he testified were copies of an original tape made in Sony Hi-8 format. The WCJ viewed the tapes over the objection of the claimant that the tapes were not the originals. One of the tapes shows Howard working on a fence on March 17, 2001. Howard's activities on June 26 and June 27, 2001, are recorded on the other tape. Howard is shown working on a truck part on June 26, the date of his visit to Dr. Bailey. He is then shown working on a pickup truck on the next day. Howard also objected to the tapes on the grounds that they were irrelevant; he argued that they did not show him doing any activity outside of his medical restrictions, but the judge overruled this objection as well.
After hearing the testimony and considering the evidence, the WCJ decided that Howard had made false statements for the purposes of obtaining workers' compensation. The WCJ gave extensive verbal reasons for her ruling, stating in part:
The video tapes presented to this Court... show that on March 17th, 2001, the claimant was lifting a board and doing hammering. He was pushing and holding wire with his right hand. He was twisting wire with pliers with his right hand on a fence. He was pulling a line and a cord with his right hand. He was jerking the line and cord with pliers in his right hand. He was pulling and jerking with a hard motion with his right hand, twisting and pulling and jerking, once again, and several other times with his right hand. Unrolling wire and lifting wire. Holding up wire using his right hand. On June 26th, 2001, the video tape show (sic) that he was prying and *1283 unscrewing items with his right hand. The Court noticed that on this right handor his fingers were covered with oil, indicating that he was performing some work activities. However, the most persuasive evidence that the Court saw on that video tape occurred on June 26th, 2001, when the Court noted that at approximately 3:52 p.m. the claimant was prying an object forcibly using his right hand. He was pressing down. He had an object in his hand which appeared to be a crowbar, was pressing down using that crowbar, twisting his wrist as he was doing it, applying body weight onto the object that he was using his right wrist. This is the same type of work that he was doing on the day that he said he was in so much pain that he can't do it. The court doesn't believe he was in pain on the 26th becauseI went back and looked at the video tape. That happenedthe prying of the object occurred at 3:52 p.m. At 4:21 p.m. on June 26th, 2001, he was still working. At 7:21 p.m. on June 26th, he was still working. And this is the same date that he went to Dr. Bailey ... and told him he was unable to do anything twisting, turning and using tools without pain. The person depicted in that video, same being, Mr. Gary Howard, does not appear to be one who is unable to do twisting and turning with his right hand without pain.
The judge dismissed Howard's claim for compensation, and Howard now appeals.

DISCUSSION
Surveillance Video
Howard contends on appeal that the WCJ erred in admitting dubbed copies of the surveillance videos into evidence. We disagree. La. R.S. 23:1317(A) reads, in part, "The workers' compensation judge shall not be bound by technical rules of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence...." The videotape evidence was sufficiently authenticated for the purpose of this hearing through the testimony of the private investigator and was clearly relevant. The private investigator testified that Howard was the person depicted on the tapes, and he gave a sufficient foundation to ensure the reliability of the tapes. Although the tapes were copies, there was no evidence that DeFatta had added or removed any portions of what he videotaped on the dates in question.
False Statements
Howard next contends that the WCJ erred in finding that he had made false statements willfully and for the purpose of obtaining workers' compensation benefits. La. R.S. 23:1208 provides, in part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
* * *
[2] E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
This statute authorizes forfeiture of benefits upon proof that (1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit *1284 or payment. The statute applies to any false statement or misrepresentation made willfully by a claimant for the purpose of obtaining benefits. Resweber v. Haroil Construction Co., 94-2708 (La.09/05/95), 660 So.2d 7.
Whether a workers' compensation claimant has forfeited his right to benefits by making a false statement for the purpose of obtaining benefits is a question of fact that will not be disturbed on appeal absent manifest error. Bossier Electric v. Cubley, 35,852 (La.App.2d Cir.06/14/02), 821 So.2d 685. Statutory forfeiture must be strictly construed. Wise v. J.E. Merit Constructors, Inc., 97-0684 (La.01/21/98), 707 So.2d 1214.
In applying the manifest error clearly wrong standard of review, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.07/01/97), 696 So.2d 551. The primary evidence which persuaded the WCJ that Howard was able to work was the videotapes. Our viewing of these tapes and our review of the remainder of the record leads this court to conclude that a reasonable factual basis does not exist for the WCJ's finding that Howard made false statements for the purpose of obtaining benefits, and the record establishes that this finding is clearly wrong.
Howard did not claim that the condition of his wrist and hand rendered him entirely unable to perform the tasks expected of him by his employer. Rather, he was simply claiming that at certain times, certain tasks caused him pain. Howard described his ability to use his right hand this way:
Some things, sometimes my hand don't bother me at some of the things I do. And then, sometimes it affectsI could be doing the same thing I was doing yesterday and then my hand bothers me.
* * *
I have weird burning sensations, tingling sensations, in my hand. I ache. I hurt. And in some positionssometimes when I get my hand in that certain positions, itit flares up real bad.
"Evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity." Orgeron v. Tri State Road Boring, Inc., 434 So.2d 65 (La.1983). During much of the video, Howard's hands are partially obscured by vegetation or other individuals. The video jerks and is not very clear at times, making it difficult to determine exactly what Howard may have been doing or what tool he was holding at a particular time. Moreover, there are gaps of time in the tape, either because Howard left DeFatta's view or DeFatta had to move to keep from being discovered filming Howard.
Howard was filmed on March 16 while he stood with other individuals in front of Howard's home. He was filmed the next day as he and several other men installed a chicken wire fence from approximately 9:21 a.m. to 12:47 p.m., with numerous time gaps. Howard was captured holding fence posts, pulling or tugging on wire, twisting and cutting wire with pliers, twisting a metal tie on a fence post, *1285 and unrolling and holding up a roll of chicken wire. Howard did not work the entire time, as he was sometimes shown standing around, smoking cigarettes, and at one point he even appeared to be playing with some dogs.
We reference Howard's testimony regarding the use of pliers or wire cutters:
Like I said, sometimes I don't hurt. Sometimes I do. Some days I can get up and I could probably use pliers all day long and it not bother me. Some days I can go out there and in five minutes get my wrist in the right way I don't know which way. I don't know how to explain it. But sometimes it hits the nerve in my hand and it aggravates my arm.
On April 24, 2001, Dr. Bailey reviewed a videotape of Mr. Howard engaging in some activities on an unspecified date and said:
After reviewing the video tape of Mr. Howard, I do believe that he is doing activities with that hand and forearm but certainly he is not using his hand in normal fashion compared to his left hand. I've actually encouraged Mr. Howard to do activities around the house in an attempt to build up strength and would still place those restrictions as obtained from the FCE and Dr. Springmeyer.
Emphasis supplied.
The next videotape made available to the WCJ was from June 2001. On June 26, Howard is depicted as working on what appears to be a pickup truck wheel that had been placed on the ground. Video was filmed on this date between 1:56 p.m. and 7:25 p.m., although the majority of the relevant activity occurred between 3:30 p.m. and 4:43 p.m. Once again, there are several gaps of time in the video. Exactly what Howard was doing is sometimes difficult to determine because he was often obscured by tall grass or weeds. In any event, Howard appeared to be working at times with a wrench. He is also shown cleaning the wheel with a rag, picking up the wheel with both hands and holding it upright, and dragging a part with both hands to the pickup truck. What particularly invoked the WCJ's ire was when Howard was shown at 3:52 p.m. pushing down on what appeared to be a crowbar in an attempt to pry a part off the wheel. The WCJ stated, "This is the same type of work that he was doing on the day that he said he was in so much pain that he can't do it."
What is shown on the video from June 26 are mere minutes of Howard using a crowbar in a like manner to what he was doing on June 11. He was definitely prying with the crowbar from 3:51.34 to 3:52.10, from 3:52.36 to 3:52.56 and from 3:53.44 to 3:54.12, for a total of 84 seconds. He was arguably using the crowbar to pry from 3:55.10 to 3:55.20 and from 3:55.24 to 3:55.59, a total of 45 seconds. We compare this to Howard's testimony that he stopped working from pain on June 11 while attempting to pry a baseboard, after removing door trim and crown molding with a pry tool or, at the very least, Holyfield's testimony that Howard complained after working for a couple of hours.
The video of the final day of Howard's activities played for the court was June 27, 2001. Howard was shown working on what appeared to be brakes for the pickup truck. On this date, he was often obscured by the wheel well of the pickup truck where he was working. Howard appeared to be using a wrench at times. He is shown hitting a part with light taps from a unknown tool for less than one *1286 minute. He is later shown tapping an auto part with a hammer for approximately 30 seconds and then for approximately 50 seconds.
We find it significant that Howard was encouraged by Dr. Bailey to use his wrist, and if he experienced any pain, to attempt to work through the pain. We do not find it significant that Howard was examined by Dr. Bailey on June 26, the same date DeFatta filmed him prying with the crowbar, as noted by the WCJ. Presumably this examination took place prior to the filmed activity which commenced at 1:56 in the afternoon and extended to the early evening hours. In any event, Dr. Bailey reported that Howard had some pain in the thumb and index distribution, but no hypesthesias. Moreover, Dr. Bailey stated, "I believe if he would continue to attempt to use the hand and forearm despite subjective complaints of pain, then I believe his symptoms will hopefully improve over a period of time." Thus, Howard would have been doing that afternoon exactly what his physician had told him to do.
Job Description
Howard further contends that vocational rehabilitation counselor Ed Earhart and Holyfield fabricated a job description that they knew Dr. Bailey would approve. We find no merit to Howard's assertion that the job description was somehow a violation of La. R.S. 23:1208. The description appears appropriate to the type of work that a carpenter would be called upon to perform and does not have any indicia of falsity.
La. R.S. 23:1127
Howard's final argument on appeal is that Earhart and Lisa Anderson violated La. R.S. 23:1127 when they met with Dr. Bailey without Howard being present. Anderson was an employee of Health Choice Solutions, apparently an administrator for LUBA. La. R.S. 23:1127 provides, in part:
(C)(2) In any verbal communication or personal conference between the vocational rehabilitation counselor and any health care provider, for the purpose of providing rehabilitation services, the employee or his agent or representative shall cooperate in scheduling a reasonable date and time for such communication or conference and the employee or his agent or representative shall be given fifteen days notice of any such communication or conference, and shall be given the opportunity to attend or participate in the communication or conference.
Howard contends that he was not aware that Earhart was going to meet with Dr. Bailey until he called Dr. Bailey's office to inquire about a scheduled appointment when Anderson was to be present. Howard stated that he then called Earhart and told Earhart to notify him before meeting with his physician, and that he wanted to be present for the meetings. According to Howard, he had previously told Anderson that he wanted to be present when she met with his physician. Howard contends that due to a train, he arrived late to the scheduled appointment. When he arrived at Dr. Bailey's office, he witnessed Anderson and Earhart coming out of Dr. Bailey's office, and Earhart told him that Dr. Bailey had signed the job description.
Dr. Bailey approved of the job description on May 30, 2001. Anderson sent a letter to Dr. Bailey dated June 1, 2001, in which she thanked Dr. Bailey for meeting with her regarding Howard on May 30, 2001. Dr. Bailey's progress note from *1287 May 31, 2001, states, "Reviewed job analysis as proposed. I certainly agree that the patient is able to perform these activities as outlined by Ed Earhart, rehab counselor and Lisa Anderson, case manager." The records do not clearly show that Dr. Bailey met with Earhart and Anderson outside the presence of the claimant, and the WCJ obviously did not accept Howard's testimony on this point.
Howard also testified that Anderson met with Dr. Springmeyer outside his presence while he was in the waiting room after his appointment. We note that Howard did not know the topic of the conversation between Anderson and Dr. Springmeyer. Moreover, Howard stated that Anderson had another client at Dr. Springmeyer's office at the same time, which does not eliminate the possibility that Anderson was speaking with Dr. Springmeyer about the other client. This assignment of error is without merit.

CONCLUSION
At appellee's costs, the judgment is affirmed insofar as it denied appellant's claims that defendant violated La. R.S. 23:1127 and 23:1208; in all other respects, the judgment is reversed, and this matter is remanded.

DECREE
At appellee's costs, the judgment is REVERSED in part, AFFIRMED in part, and REMANDED.
KOSTELKA, Judge Pro Tempore, dissents with written reasons.
KOSTELKA, Judge Pro Tempore dissenting.
I must respectfully dissent. The majority opinion substitutes its finding of fact for that of the Workers' Compensation Judge who had the additional benefit of observing the appellant's demeanor at trial. Whether or not a claimant has forfeited his workers' compensation benefits by misrepresentation is a question of fact and even though an appellate court may disagree with the conclusion of the trial judge, it should not reverse. The Workers' Compensation Judge gave extensive and detailed reasons for her conclusion and where there are two permissible views of the evidence, a fact-finder's choice between them can never be manifestly erroneous or clearly wrong. Stobart v. State, 617 So.2d 880 (La.1993).