893 So.2d 137 (2005)
Robertine MOORE, Plaintiff-Appellee
v.
CONAGRA POULTRY COMPANY, Defendant-Appellant.
No. 39,283-WCA.
Court of Appeal of Louisiana, Second Circuit.
January 26, 2005.
*138 Hayes, Harkey, Smith & Cascio, by John B. Saye, Monroe, for Appellant.
Langston Law Firm, by Carlton L. Parhms, for Appellee.
LOLLEY, J.
ConAgra Poultry appeals from a judgment of the Office of Workers' Compensation, District 1E, Ouachita Parish, the Hon. Brenza Irving presiding, awarding indemnity benefits, penalties and attorney fees to claimant Robertine Moore. Moore has answered the appeal, seeking an increase in attorney fees. We affirm and additionally award $1,000 in attorney fees.

FACTS
Robertine Moore was employed by ConAgra Poultry in Farmerville, Louisiana as a chicken grader. Moore was required to monitor the processing line and, among other things, had to pull fat off the chickens as they came by and throw it into a box. On May 3, 2002, she was performing this job when she injured her right shoulder. She said:

*139 [W]hile I was making sure the chickens was falling right and making sure all the parts was there, taking them out and pulling the fat, I reached up to flick some fat and my arm just went down and give out.
She reported the incident to her supervisor and attempted to continue work on another part of the line. However, she was unable to continue working for long, so she left her shift early. The following Monday Moore was able to see a doctor authorized by the plant, Dr. Stevens Venters. Dr. Venters' records from May 7, 2002, reflect only that he diagnosed Moore with a right shoulder injury and prescribed Naprosyn, Skelaxin and directed her to rest. Moore returned to light duty work for one week and returned to see Dr. Venters on May 14, 2002, with continued complaints of pain. At that time, Dr. Venters referred Moore to an orthopedist.
Moore then saw orthopedic surgeon Dr. Robert Ballard at the Green Clinic in Monroe on May 27, 2002. Dr. Ballard diagnosed Moore with a rotator cuff strain and gave her injections of painkillers and steroids. Dr. Ballard instructed Moore to limit her activities for two weeks until she could return to him and advised her to continue working with restrictions. She returned to see Dr. Ballard on June 7, 2002, complaining of "a tremendous amount of pain" in her shoulder. Dr. Ballard recommended physical therapy and directed her to return to see him in three weeks. Moore continued working during this time but said that the accommodations for her injury, including avoiding work on the "cold" side of the plant, were not sufficient to reduce her pain. Moore returned to see Dr. Ballard on June 27, 2002, and her condition was apparently unimproved. Dr. Ballard's notes from that date reflect his belief that Moore "quite likely has rotator cuff tear and is going to need exploration, decompression and repair as necessary." Dr. Ballard noted in his deposition that Moore was consistently upset at her visits with him and generally refused to move her arm during the examination.
On July 1, 2002, Moore saw Dr. Ballard again with complaints of great shoulder pain. She was by that point undergoing a round of steroid therapy which had given her "a little bit" of pain relief. The doctor again recommended surgery. Also, on that same day the doctor completed an "Employer's Workers Compensation Status Report" noting that Moore had injured her rotator cuff, stating that she needed surgery, and ordering that Moore remain off work until after surgery.[1] This report explicitly said: "THE EMPLOYEE HAS BEEN INSTRUCTED TO: Remain off work until after surgery ..." This was an open-ended recommendation; the follow-up portion of the report set the next appointment as "surgery" "tba."
After the "off-work" order was forwarded to ConAgra, someone in the ConAgra nursing department called Dr. Ballard's office. In response to that phone call, Dr. Ballard apparently faxed ConAgra a new "Employer's Workers Comp. Status Report." The second page of this report contained a preprinted section consisting of a series of descriptions with a line beside them allowing the doctor to check off any description that best described the employee's status. The first option in this section was "Return to work with no limitations." The next option was "Return to work with the following limitations," and following that option, ten other restriction options were listed. The last of these *140 options included a "Patient is able to" section which had a series of restrictions for bending, squatting, climbing, twisting and reaching. Dr. Ballard did not check any of the preprinted options or complete any of the preprinted restrictions.[2] Finally, at the end of the section there was a fill-in-the-blank option labeled "Other restrictions." In this section, Dr. Ballard noted, "Absolutely no use of [right] arm." He also noted that the restrictions were in effect until the patient was reevaluated in two weeks. Dr. Ballard had no record of speaking with anyone at ConAgra.
The head nurse and occupational health manager at ConAgra, Barbara Daugherty, testified at the trial initially that she had been the one who spoke to Dr. Ballard. However, in reviewing the records kept of the conversation, Daugherty evidently discovered at trial that another nurse, not herself, had actually spoken to Dr. Ballard. That nurse's notes from July 9, 2002, reflect:
Spoke to Dr. Ballard via phone and Dr. Ballard stated emp could rtw c no use r arm. Dr. Ballard expressed concern that emp is exaggerating her symptoms but that he couldn't disprove her claim.
The notes were offered into evidence by ConAgra, but the OWC refused to admit them on the grounds that the information in the note was double hearsay. ConAgra proffered the notes instead.
The doctor's office evidently did not communicate this information to Moore.[3] However, Daugherty called Moore and informed her that Dr. Ballard had released her to return to work. Moore said that she did not return to work because Dr. Ballard had taken her off work on July 1, 2002. Moore did not return to work, and ConAgra fired her for that reason. She thereafter went to an emergency room on occasion with complaints of great pain in her shoulder and received injections of painkillers.
Moore returned to see Dr. Ballard for the last time on August 1, 2002. Dr. Ballard reported that Moore was "complaining bitterly" about the pain in her shoulder and would not move it at all. Dr. Ballard again recommended surgery and noted that Moore apparently has an extremely poor pain tolerance. The doctor's report said nothing about Moore returning to work. ConAgra paid one payment of indemnity benefits to Moore in September 2002.
Because of Dr. Ballard's recommendation for surgery, ConAgra scheduled Moore to see a second orthopedist in October 2002. Moore saw Dr. Randolph Taylor on October 9, 2002, and had continued complaints of right shoulder pain. The doctor conducted a physical exam of Moore and concluded that her pain was "out of proportion to history and physical examination" and that Moore "has psychological overlay and is embellishing her symptoms." Moore subsequently had an MRI and a bone scan. Neither study revealed any significant abnormality in her shoulder. Dr. Ballard explained that he had "seen MRI's miss things" and maintained his recommendation for surgery based on his experience with similar injuries. Moore eventually developed a blood clot in her back that required treatment, but which was not clearly causally related to her shoulder injury.
*141 On March 11 2003, Moore went to see Dr. Baer Rambach for an independent medical examination (IME) ordered by the OWC. Dr. Rambach recommended a cervical MRI and noted:
If, indeed, the cervical MRI is within the limits of normal, I would have to agree with Dr. Randall Taylor that this patient is magnifying and embellishing her symptomatology. Her findings do not follow any specific pattern and there seems to be a great deal of magnification, not only with her symptoms, but as well as her physical examination. I would not recommend any surgical intervention to her right shoulder. This would only complicate matters and in my opinion would not effect any improvement in her current state....
At the present time I do not believe that this patient is capable of performing any type of employment until we do have an MRI of the cervical spine. I do not believe a Functional Capacity Evaluation could be performed since it would not be valid. I do not believe the patient would be able to cooperate sufficiently enough to perform an honest evaluation.
Subsequent to that visit, Moore had a cervical MRI. The MRI revealed several abnormalities in Moore's cervical spine but, as Dr. Rambach noted on July 1, 2003, "there is no full blown frankly herniated invertebral disc noted." Dr. Rambach recommended electrodiagnostic studies to rule out nerve problems. A medical report from January 28, 2004, indicated that the nerve conduction studies were performed and were normal. Moore underwent a physical exam by Dr. Zum Brunnen on that date and the report noted that she refused to comply with "all motions due to a complaint of pain...." The assessment section of the report noted: "Neck pain and degenerative joint disease. Per patients review of past notes and the MRI. Her pain appears to be on the contralateral side of any type of pathology." The report recommended that:
We recommend that the patient go to physical therapy. Patient states that she cannot tolerate the physical therapy due to pain, although that is our recommendation. In her current state, she is unable to return to her current duties; however her physical findings do not correlate and we are also unable to explain her lack of progress. She may return to the clinic as needed.
After hearing all of the evidence, the OWC concluded that Moore had proven her entitlement to temporary total disability benefits from July 1, 2002, onward. The OWC took the unusual step, based upon the reports of possible symptom magnification, of ordering that ConAgra cease paying benefits if Moore refused to attend physical therapy. The OWC also found that there remained no doubt that Moore was temporarily totally disabled after the March 2003 IME report and awarded Moore a $2,000 penalty and $5,000 in attorney fees based upon ConAgra's failure to reinstate benefits after receiving that report. ConAgra now appeals.

DISCUSSION
On appeal, ConAgra raises three assignments of error. First, it argues that the workers' compensation court erred by not admitting into evidence the computer generated notes of the ConAgra nurses under the relaxed standard for evidence in administrative courts prescribed by La. R.S. 23:1317 and/or under the business records exception of La.Code of Evidence 803(6).
We agree that evidentiary standards in workers' compensation cases are relaxed by comparison to those in ordinary *142 civil actions. Louisiana R.S. 23:1317 provides, in pertinent part:
A....The workers' compensation judge shall not be bound by technical rules of evidence or procedure other than as herein provided, but all findings of fact must be based upon competent evidence....
See Chaisson v. Cajun Bag & Supply Co., 97-1225 (La.03/04/98), 708 So.2d 375, 383, wherein the court noted:
To give effect to the more relaxed evidentiary standards in LSA-RS 23:1317, we hold that the hearing officer has the discretion to admit hearsay evidence in worker's compensation proceedings. We further hold that such evidence can qualify as "competent evidence," provided that the evidence has some degree of reliability and trustworthiness and is of the type that reasonable persons would rely upon. This determination must be made on a case-by-case basis under the particular facts and circumstances. The reviewing court must evaluate the competency of the evidence under the manifest error standard.
The Chaisson court further explained the familiar manifest error standard of review:
In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. "Thus, `if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" (Citations omitted).
Id. at 381. Moreover, regularly kept business records, when properly verified, are also admissible even though they are hearsay unless they are insufficiently trustworthy. La. C.E. art. 803(6).
However, in this instance the decision of the OWC to exclude the evidence was not manifestly erroneous. The other evidence on the question of Moore's ability to return to work on July 9, 2002, showed the following. First, as recently as July 1, 2002, Dr. Ballard ordered that Moore not return to work until she had surgery and did not put an ending date on that restriction. Next, Dr. Ballard had no record, and expressed no recollection, of telling ConAgra that Moore could return to work on July 9, 2002. Finally, Dr. Ballard had no written advice for Moore to return to work at her last visit to him on August 1, 2002. The records were hearsay within hearsay as well, reciting what Dr. Ballard allegedly told another ConAgra nurse who did not testify. All of these factors weighed against allowing the records into evidence, so the decision of the OWC was not clearly wrong. This assignment of error is without merit.
In its second assignment of error, ConAgra argues that legal error was made by awarding indemnity benefits to Moore after July 9, 2002, when she refused to return to work, despite being released for return to work by her treating physician.
Louisiana R.S. 23:1221 provides, in pertinent part:
(1)(c) [C]ompensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, *143 sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made and the employee's physical condition has improved to the point that continued, regular treatment by a physician is not required.
By virtue of the July 1, 2002 order from her doctor preventing Moore from working until she had surgery, Moore established by clear and convincing evidence that she was disabled from employment. At that point, she became entitled to temporary total disability benefits ("TTD"). Subsection (d) of the statute specifies that such an award shall cease when (1) the employee's physical condition has resolved to the point where her disability may be determined and (2) continued regular treatment by a physician is not required. Clearly by July 2002 the medical cause and extent of Moore's disability had not yet been fully determined. Notably, at that point in Moore's treatment the only extant medical recommendation was for surgery. The equivocal order from Dr. Ballard ordering that Moore not use her right arm, but not explicitly allowing her back to work with that restriction, is insufficient to satisfy La. R.S. 23:1221(1)(d). Compare Jackson v. Wal-Mart Stores, Inc., 03-1054 (La.App. 5th Cir.02/10/04), 868 So.2d 813. We also observe that this order was not transmitted to Moore, see La. R.S. 23:1127(C)(3), which action would have given Moore an opportunity to discuss the order with Dr. Ballard and potentially avoid the confusion that ensued. Hooker v. Wal-Mart Stores, Inc., 38,350 (La.App.2d Cir.04/07/04), 870 So.2d 1131, writ denied, XXXX-XXXX (La.09/24/04), 882 So.2d 1142.
In its final assignment of error, ConAgra argues that the trial court erred by awarding penalties and indemnity benefits, because ConAgra acted on the basis of a verbal order from Moore's treating physician that she could return to work, which was also confirmed by an employee status report dated July 9, 2002.
Per its stated reasons, the OWC awarded Moore a $2,000 penalty and $5,000 attorney fee because ConAgra failed to commence paying her indemnity benefits on March 11, 2003, when the IME report stated, "At the present time I do not believe that this patient is capable of performing any type of employment until we do have an MRI of the cervical spine." The award was not based on ConAgra's failure to pay benefits from July 1, 2002.
The penalty provisions in effect at the time of the alleged denial of benefits control. Gay v. Georgia Pacific Corp., 32,653 (La.App.2d Cir.12/22/99), 754 So.2d 1101. In March 2003, the prior versions of La. R.S. 23:1201 (failure to pay benefits) and La. R.S. 23:1201.2 (discontinuance of benefits, now repealed and incorporated into La. R.S. 23:1201) remained in effect. See Acts 2003, No. 1204, § 1. Because the OWC concluded that ConAgra failed to pay benefits commencing on March 11, 2003, and did not take into account one payment from 2002, La. R.S. 23:1201 controls.
Former La. R.S. 23:1201(F) provided, in part:
Failure to provide payment in accordance with this Section shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever *144 is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim....
....
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Royals v. Town of Richwood, 38,738 (La.App.2d Cir.08/18/04), 880 So.2d 208. The determination of whether an employer should be cast with penalties is a question of fact for the WCJ, whose findings shall not be disturbed on appeal absent manifest error. Id. An award of attorney fees is a type of penalty in workers' compensation matters. Id. The amount of the fee must be assessed in accordance with law, i.e., the fee must be reasonable. Id.
We find no manifest error in the award of penalties and attorney fees in light of this record as a whole. We fully recognize that the medical evidence repeatedly suggests that Moore is magnifying or exaggerating her symptoms. Nevertheless, there is no medical report in this record after July 1, 2002, that explicitly releases Moore to work, and indeed the reports following July 9, 2002, uniformly say that, for various reasons, she is not yet capable of returning to work.
Finally, we award Moore an additional $1,000 in attorney fees for the work necessitated in addressing ConAgra's appeal, which Moore requested in her answer to appeal. See Smith v. Tudor Const., 25,783 (La.App.2d Cir.05/04/94), 637 So.2d 666.

CONCLUSION
The judgment of the OWC is affirmed. Costs are assessed to ConAgra, and Moore is awarded an additional $1,000 in attorney fees for this appeal.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] The record also suggests that Dr. Ballard took Moore off work on June 24, 2002, but this written order is dated July 1, 2002.
[2] On identical forms that he had completed earlier in the course of treatment, Dr. Ballard had checked the lines by "Return to work with the following limitations:" followed by other boxes restricting Moore's use of her right arm.
[3] See La. R.S. 23:1127(C)(4).