935 So.2d 308 (2006)
Horace Wayne BRANTLEY, Plaintiff-Appellant
v.
DELTA RIDGE IMPLEMENT, INC., Defendant-Appellee.
No. 41,190-WCA.
Court of Appeal of Louisiana, Second Circuit.
June 28, 2006.
*311 Street & Street by: Curtis Daniel Street, Monroe, for Appellant.
Hurlburt, Privat & Monrose by: Shannon Seiler Dartez, Lafayette, for Appellee.
Before BROWN, GASKINS and LOLLEY, JJ.
*309 GASKINS, J.
Horace Brantley, the claimant in this workers' compensation case, appeals from a judgment rejecting his claim for indemnity benefits, as well as some of his claims for penalties and attorney fees. We affirm.

FACTS
The claimant was employed as a farm tractor and large implement mechanic at Delta Ridge Implement, Inc. ("Delta") for approximately 15 years. His job duties included heavy manual labor; he sometimes had to manually lift tractor parts that weighed as much as 100 pounds or use a torque wrench to hand-tighten fasteners requiring 580 ft.-lbs of torque. He also had to climb atop tractors or other equipment on occasion.
On July 21, 2003, the 61-year-old claimant was reassembling a tractor at work. As he pulled some of the machinery together, he strained too hard and injured his back. The claimant felt a burning in his back and a numbness in his left leg. After informing his supervisor of the accident, he left work and went to see his family doctor, Joe Najjar. Dr. Najjar gave the claimant a shot for pain, prescribed painkillers, and restricted him from working for two weeks. Delta voluntarily commenced paying him temporary total disability benefits from the date of his injury.
The claimant continued to have back pain and leg numbness, and on July 23, 2003, he began seeing a chiropractor, R.B. Hawthorne, D.C. Dr. Hawthorne diagnosed the claimant with a bilateral lumbrosacral strain and treated the claimant's pain with electrical muscle stimulation and mechanical traction. The claimant remained off work and continued these treatments for approximately three months. He also saw Dr. Najjar in July, in August, and in October. An MRI done on October 10, 2003, found several "minimal" posterior disc bulges and no disc herniation or nerve root impingement. The final report from Dr. Hawthorne's office stated that the claimant last saw Dr. Hawthorne on October 30, 2003, and on that visit he self-rated his pain as a one (least severe) on a one-to-ten scale. He had rated his pain as a ten at the first visit. The claimant testified that the chiropractic treatments gave him some temporary relief but provided no permanent results. He did not return to work.
On November 3, 2003, the claimant saw Dr. Najjar again with complaints of severe lower back pain, so Dr. Najjar referred the claimant to Dr. Timothy Spires, an orthopedic surgeon. On November 11, 2003, the claimant saw Dr. Spires, who diagnosed him with a lumbrosacral strain and recommended physical therapy. He underwent physical therapy but returned to Dr. Spires on January 8, 2004, with continued complaints of pain and numbness in his leg. Dr. Spires ordered an EMG study of his leg. For treatment, he recommended a home exercise program for the claimant. The EMG study was negative for pathology, and Dr. Spires' notes from January 27, 2004, recommended that the *312 claimant undergo a functional capacity evaluation ("FCE").
The claimant underwent the FCE on February 10, 2004, at the Orthopedic Clinic of Northeast Louisiana. The report from the FCE showed that he gave a reliable effort on the test, and the examiner concluded that he could return to work doing heavy work. The report noted his complaints of back and leg pain at a "4/10 pain level" during the testing and indicated that he might need to be "accommodated" while working at the level tested.
On February 17, 2004, the claimant returned to see Dr. Spires and maintained that he continued to have back and leg pain. Dr. Spires' report from that day reflects, in part:
HISTORY: He has completed his Functional Capacity Evaluation which was reviewed and it appears that he can return to work at a heavy work level. He still has some problems riding.
ASSESSMENT: I discussed at length with patient that I feel he has reached MMI on this date and that I feel he can work a heavy schedule and will be okay. I see no permanent impairment and he will follow-up on a p.r.n. basis.
On February 21, 2004, after receiving Dr. Spires' report, Delta's compensation insurer terminated the claimant's indemnity benefits. The claimant also testified that Delta thereafter refused to allow him to see Dr. Hawthorne.
On March 16, 2004, the claimantat his own expensesaw Dr. Guy Vise, an orthopedic surgeon in Mississippi. The claimant complained of moderate to severe back pain that commenced with his 2003 accident and that had continued since that time. Dr. Vise observed that the claimant had some degenerative disc disease in three lumbar discs. The doctor recommended against surgery but recommended 12 weeks of physical therapy and a spinal orthosis-a special back brace for decompressing a patient's spine. The doctor opined that he was not at maximum medical improvement. Dr. Vise's report stated in part:
I explained to [Mr. Brantley] that at the end of 12 weeks [of therapy] should he feel capable of returning to work my advice would be to return to work with this orthosis on, wearing it two hours at the beginning of the shift then off for four hours and then on for two hours at the end of his work shift and then two additional hours in the evening at home.
The claimant could not afford the recommended back brace and so never obtained the device; likewise, he did not undergo the recommended therapy. He remained off work.
In April 2004, Dr. Najjar wrote a letter "to whom it may concern" stating his agreement with Dr. Vise's recommendations. Dr. Najjar stated:
I am deeply concerned that an inadequate treatment of Mr. Brantley's condition, coupled with a hasty return to work, may aggravate the problem substantially and lead to disc herniation, which in turn would lead to surgical intervention with all the potential complications associated with such a procedure.
In June 2004, Dr. Spires wrote Delta's attorney a letter in response to an inquiry about the claimant's condition; Dr. Spires referred to Dr. Najjar's letter and said that the recommended brace "would be fine by me."
In October 2004, in a letter between counsel, the claimant asked to see a neurosurgeon, Dr. Bernie McHugh. Delta responded with a letter on November 16, 2004, asking the claimant for "any evidence that treatment with Dr. McHugh is medically necessary and warranted at this *313 time." In November 2004, the claimant filed a disputed claim for compensation in the Office of Workers' Compensation ("OWC"). In February 2005, he asked the OWC to order Delta to pay for treatment by Dr. McHugh. The motion was set for a hearing in March 2005, but in February, Delta agreed to pay for an evaluationbut not treatmentof the claimant by Dr. McHugh. Thereafter, the claimant again sought an order from the OWC directing Delta to pay for the treatment recommended by Dr. McHugh.
In March 2005, Dr. McHugh examined the claimant. Dr. McHugh reviewed his MRI and found no correlation between what he saw there and his complaints of pain; he then ordered a CT myelogram study of the claimant's lumbar spine. The scan revealed, among other things, disc bulging at L3-4. Delta apparently agreed thereafter to pay for the treatment recommended by Dr. McHugh, so the claimant withdrew his renewed formal demand for treatment. After the CT scan was performed, the claimant returned to see Dr. McHugh on May 24, 2005, where the doctor discussed performing surgical decompression at the L3-4 level; the doctor's note indicates that he was then awaiting approval for the surgery through workers' compensation.
In May 2005, the claimant was evaluated by Delta's choice of neurosurgeons, Dr. Donald Smith. Dr. Smith's recommendations state:
I believe that the patient does have significant degenerative disc changes at the L3-L4 level as indicated above. The degree of defect would be considered significant and in many cases, may provide some indications in favor of surgical therapy. I feel that the likelihood of the patient being significantly improved by surgical treatment is very low. I feel that the likelihood of returning this patient to any significant level of work activity by surgery is also very low. The degenerative changes have radiographic appearance of chronic changes, which may have evolved secondary to so-called "wear and tear" over time. I feel that it is more probable than not that these changes are longstanding, chronic, and related to degenerative changes. I cannot be more specific with regards to their relationship to the injury in question.
In June 2005, the claimant filed a motion to compel Delta to pay for the surgery recommended by Dr. McHugh.
The matter went to trial in July 2005. The claimant testified that his back and leg pain commenced with the accident and continued to trouble him. Specifically, he testified that the pain limits his ability to perform various physical tasks and prevents him from working. The claimant's supervisor at Delta, Johnnie Burroughs, also testified. Burroughs testified that he called the claimant in April 2004 to offer him his job back at the same rate of pay and told him that Delta "would try to put him on some kind of a light duty and, you know, get him some help." The claimant declined to attempt to return to work.
On September 22, 2005, the workers' compensation judge ("WCJ") gave verbal reasons for judgment. After a detailed consideration of the claimant's medical treatment, the WCJ observed that the claimant was a credible witness. The WCJ found that Delta was arbitrary and capricious in refusing to pay for the back brace recommended by Dr. Vise and stated that an award of penalties and attorney fees was appropriate. Likewise, the WCJ found that the claimant needed further chiropractic treatment and the surgery recommended by Dr. McHugh and so ordered *314 Delta to pay for those items.[1] The WCJ decided that Delta was reasonable to ask for proof of medical necessity prior to authorizing the examination and treatment of the claimant by Dr. McHugh; no penalty or attorney fees were awarded due to that incident. The WCJ found that Dr. Smith's opinion reasonably controverted that of Dr. McHugh and thus refused to award penalties or attorney fees for Delta's refusal to pay for the surgery recommended by Dr. McHugh. Further, the WCJ reviewed the medical records, including the report from Dr. Vise, and concluded that the evidence failed to establish the claimant's inability to return to some type of work. Because the claimant did not attempt to return to any type of employment after his injury, including the modified position actually offered to him by the employer at the same rate of pay, the OWC denied his claim for indemnity benefits.
In its judgment, the OWC ordered Delta to pay for the back brace recommended by Dr. Vise and awarded the claimant $2,000.00 in penalties and $3,000.00 in attorney fees for Delta's refusal to approve this device. Further, the OWC ordered Delta to pay for the spinal surgery recommended by Dr. McHugh, and ordered Delta to pay for further chiropractic treatment by Dr. Hawthorne. As indicated in its reasons for judgment, the OWC denied his claim for indemnity benefits and also denied any other claim for penalties and attorney fees. The claimant now appeals.

LAW

Standard of review
The manifest error standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of a workers' compensation judge. Dean v. Southmark Construction, XXXX-XXXX (La.7/6/04), 879 So.2d 112; Young v. Physicians & Surgeons Hospital, 39,348 (La.App. 2d Cir.3/2/05), 895 So.2d 723; Johnson v. Johnson Controls Inc., 38,495 (La.App. 2d Cir.5/12/04), 873 So.2d 923. Under the manifest error standard, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. Young, supra.
When legal error interdicts the fact-finding process in a workers' compensation proceeding, the manifest error standard of review no longer applies. Rather, the appellate court must, when possible, review the facts de novo and render a judgment on the merits. Kelley v. Stone Container Corporation, 31,790 (La.App.2d Cir.5/5/99), 734 So.2d 848, writ denied, XXXX-XXXX (La.10/15/99), 748 So.2d 1150.

Indemnity benefits claims
The claimant argues that the WCJ erred in failing to award him temporary total disability ("TTD") benefits or supplemental earning benefits ("SEB's").
The finding of disability within the framework of the workers' compensation law is a legal rather than a purely medical determination. Therefore, the question of disability must be determined by reference to the totality of the evidence, including both lay and medical testimony. Ultimately the question of disability is a question of fact, and the WCJ's ruling on the issue cannot be reversed in the absence of manifest error. Thomas v. Casino Magic, 39,725 (La.App. 2d Cir.5/11/05), 902 So.2d 1283, writ denied, XXXX-XXXX (La.2/3/06), 922 So.2d 1183. The claimant argues that the OWC committed legal error in its denial of his claim for benefits *315 and that this court should review the record de novo.
In Collins v. Patterson Drilling, 39,668 (La.App. 2d Cir.5/11/05), 902 So.2d 1264, this court explained how a claimant may obtain an award of TTD benefits:
To obtain an award of TTD's, a claimant must prove by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment. La. R.S. 23:1221(1)(c). This is the standard of proof which a claimant must satisfy when he files a disputed claim form seeking an award of TTD benefits after the employer or insurer terminates voluntary payments of TTD's. [Citations omitted.]
To prove a matter by clear and convincing evidence, as required to establish entitlement to TTD benefits, means to demonstrate that the existence of a disputed fact is highly probable, i.e., much more probable than its nonexistence. Hammock v. Weyerhaeuser, 40,464 (La.App. 2d Cir.12/14/05), 917 So.2d 733.
The WCJ noted that Dr. Spires had released the claimant to work without restrictions in February 2004 based on the FCE. The WCJ then discussed Dr. Vise's report and its reference to the claimant returning to work after 12 weeks of therapy. However, Dr. Vise's report does not indicate that the claimant could not return to work immediately in some capacity at some lighter level of duty. Dr. Najjar's caution against "a hasty return to work" likewise does not distinguish between the claimant's former employment doing heavy labor and the light duty position made available to him. As the WCJ found, the medical evidence does not clearly and convincingly show that the claimant could not return to some type of employment. Although the claimant testified that he was not physically able to work, the WCJ had the opportunity to observe him at trial and consider his condition firsthand. We perceive no error in the WCJ's decision to reject the claimant's request for TTD benefits.
In Mosley v. Pennzoil Quaker State, 39,981 (La.App. 2d Cir.9/8/05), 911 So.2d 327, this court explained the proof required for an award of SEB's:
To qualify for SEB, a claimant is required to prove by a preponderance of evidence that a work-related injury resulted in the inability to earn 90% or more of his average pre-injury wage. LSA-R.S. 23:1221(3)(a). Once the claimant makes this showing, the burden shifts to the employer, who must prove by a preponderance of evidence that the claimant is physically able to perform a certain job and that the job was offered to the claimant or was available in his or the employer's community or reasonable geographic region. LSA-R.S. 23:1221(3)(c)(I). An employer can discharge its burden by establishing (1) the existence of a suitable job within claimant's physical capabilities, (2) the amount of wages an employee with claimant's experience and training can expect to earn in that job, and (3) an actual position available for that particular job at the time the claimant received notification of the job's existence. [Citations omitted.]
The employee is deemed incapable of performing the employment offered if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform the employment offered. La. R.S. 23:1221(3)(c)(ii).
The evidence did not show that the claimant was unable to work and earn wages equal to 90 percent or more of his *316 wages at the time of his injury so as to entitle him to SEB's. Apart from the FCE that showed that he could return to heavy work without restrictions, there was little other evidence apart from the claimant's testimony to demonstrate his ability or inability to work. Further, the testimony showed that his employer offered him a modified light duty position earning the same pay as he had previously earned doing heavy mechanical work, but the claimant did not attempt to return to work even in the modified job. There was thus no evidence that the claimant could not have performed the employment offered. Hence, the WCJ correctly found that he failed to prove that he was entitled to SEB's.
The claimant argues that the OWC should have applied La. R.S. 23:1121(D) but failed to do so.
La. R.S. 23:1121 provides, in part:
D. After all examinations have been conducted but prior to any order directing the injured employee to return to work, the employee shall be permitted, at his own expense, to consult with and be examined by a physician of his own choosing. Such report shall be considered in addition to all other medical reports in determining the injured employee's fitness to return to work. Should disagreement exist, after such consultation and examination, as to the fitness of the employee to return to work, the provisions of R.S. 23:1123 shall be followed.
La. R.S. 23:1123 provides:
If any dispute arises as to the condition of the employee, the director, upon application of any party, shall order an examination of the employee to be made by a medical practitioner selected and appointed by the director. The medical examiner shall report his conclusions from the examination to the director and to the parties and such report shall be prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter. [Emphasis added.]
The claimant argues that the OWC erred as a matter of law in failing to apply these statutes in deciding his entitlement to benefits. The record shows that the claimant did indeed seek an additional medical opinion from Dr. Vise at his own expense after Dr. Spires released him to work, but we observe that the report issued by Dr. Vise was not squarely intended to address the claimant's return to work; rather, it provided a more general assessment of his condition and recommendations for treatment. Dr. Vise's report did indirectly address the claimant's ability to work with his recommendation that the claimant  after completing therapy  wear the orthotic brace for a portion of his work day. However, Dr. Vise's report did not provide the doctor's opinion about the claimant's ability to return to some type of employment without further therapy or equipment. We further note that the record does not show that either party made an application to the OWC for the examination of the claimant by a medical practitioner selected and appointed by the director as contemplated in La. R.S. 23:1123. In the absence of such a request, it was not error for the OWC to decide the case without the benefit of an independent examiner's report. See Jacquet v. Southern Structures, Inc., XXXX-XXXX (La.App. 3d Cir.5/20/98), 713 So.2d 723.

Penalties and attorney fees for improper termination of benefits
The claimant contends that the OWC erred in failing to award him penalties and attorney fees for Delta's improper termination of his indemnity benefits and its wrongful refusal to reinstate those benefits.
*317 Since the date of the claimant's accident the law has changed as to the imposition of penalties and attorney fees for the termination of benefits. The penalty and attorney fee provisions for the termination of benefits were revised by Acts 2003, No. 1204, effective August 15, 2003, almost one month after the claimant's accident. By contrast to the usual rule in workers' compensation cases, the law regarding penalties and attorney fees in effect at the time of the withholding of benefits is controlling. McGuyer v. Fidelity & Casualty Company of N.Y., 39,450 (La. App. 2d Cir.3/2/05), 895 So.2d 701[2]. Accordingly, the post-2003 version of the statute applies.
Statutory provisions allowing penalties and attorney fees are penal in nature and must be strictly construed. Tron v. Little Italiano, Inc., 38,556, 38,557, 38,558 (La.App. 2d Cir.6/25/04), 877 So.2d 1055. La. R.S. 23:1201(I) provides:
I. Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. The provisions as set forth in R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions as set forth in R.S. 22:658(c) shall be applicable to claims arising under this Chapter.
Whether or not a refusal to pay is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Freeman v. Triad Builders, 39,657 (La.App. 2d Cir.5/11/05), 902 So.2d 1220, writ denied, XXXX-XXXX (La.12/16/05), 917 So.2d 1118. If there is conflicting evidence, an employer is not arbitrary or capricious in reaching its decision to deny or terminate benefits. Freeman, supra. The determination of whether an employer should be cast with penalties is a question of fact for the WCJ, whose findings shall not be disturbed on appeal absent manifest error. Moore v. ConAgra Poultry Company, 39,283 (La.App. 2d Cir.1/26/05), 893 So.2d 137. Delta terminated the claimant's indemnity benefits in February 2004 only after the finding by Dr. Spires, based upon the results of the FCE, that the claimant could return to work without restriction. Thereafter, no physician unequivocally stated that the claimant could not return to work in any capacity, and the FCE indicated that he could return to doing heavy work, perhaps with accommodation. Delta was reasonable to terminate indemnity benefits upon receipt of the FCE and Dr. Spires' report; based upon the totality of the evidence, we detect no error in the WCJ's rulings on these questions.

Penalties and attorney fees for failure to authorize treatment by Dr. McHugh
The claimant argues that the WCJ should have awarded him penalties and attorney fees under La. R.S. 23:1201(F) for Delta's failure to authorize treatment by Dr. McHugh. La. R.S. 23:1121 provides, in part:
B. (1) The employee shall have the right to select one treating physician in any field or specialty. The employee shall have a right to the type of summary *318 proceeding provided for in R.S. 23:1124(B), when denied his right to an initial physician of choice. After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
The claimant argues that Dr. McHugh is a neurosurgeon and that his other physician of choice, Dr. Najjar, was a general practitioner. Accordingly, he argues that Delta should have approved payment for him to see Dr. McHugh rather than delay the process for several months.
The record shows that Delta responded to the claimant's request to see Dr. McHugh with a request of its own for "any evidence" that this treatment was medically necessary. In her reasons for judgment, the WCJ stated that Delta had the right to seek proof of medical necessity for this visit under La. R.S. 23:1203, which provides, in part:
A. In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services....
At the time of the request for treatment by Dr. McHugh, the claimant had seen three doctors, two of whom were orthopedic surgeons, and none of these physicians had recommended surgery for him. The most recent medical opinion, from Dr. Vise, recommended conservative treatment.
La. R.S. 23:1201 provides, in part:
F. Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:
....
(2) This Subsection will not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
Given that the claimant had already been evaluated by three physicians, none of whom recommended surgical intervention, and that an FCE reported that he could return to doing heavy work, Delta was reasonable to request further proof that a visit to a fourth doctor was necessary. The record does not show manifest error in the WCJ's finding that the claimant did not prove his entitlement to penalties and *319 attorney fees arising from Delta's handling of his request to see Dr. McHugh.

Penalties and Attorney Fees for Failure To Authorize Surgery by Dr. McHugh
The claimant argues that there was no dispute between Dr. McHugh and Dr. Smith regarding his condition and that once the employer had Dr. Smith's opinion, it was obligated to pay for the surgery for the claimant. The claimant urges that if Delta believed there was a dispute between the opinions of Dr. McHugh and Dr. Smith, it should have provoked an independent medical examination. Accordingly, the claimant argues that he is entitled to penalties and attorney fees under La. R.S. 23:1201(F).
As noted, Dr. Smith evaluated the patient after Dr. McHugh recommended surgery for the claimant, and Dr. Smith stated in part:
I feel that the likelihood of the patient being significantly improved by surgical treatment is very low.
Based on this information, the claimant's request for surgery was clearly reasonably controverted by Delta. Although his physical condition may have been well-understood by the physicians, the doctors disagreed about the appropriate course of treatment. The WCJ did not err in finding that this claim was reasonably controverted and that no penalties or attorney fees were due.

Penalties and Attorney Fees for Termination of Medical Benefits
Finally, the claimant contends that Delta should be penalized for refusing to allow him to see his chiropractor, Dr. Hawthorne, and for terminating his medical benefits entirely after the FCE result. At trial, the claimant testified that he was not allowed to see Dr. Hawthorne after the February 2004 FCE result. As pointed out by Delta in brief, there was scant evidence that he actually attempted to see Dr. Hawthorne or any of the doctors who had previously treated him once the FCE result was released. On this record, there is no showing of manifest error in the OWC's refusal to award penalties and attorney fees for this alleged wrongdoing.

CONCLUSION
The judgment of the OWC is affirmed. Costs are assessed against the appellant.
AFFIRMED.
BROWN, Chief Judge, concurs and dissents in part with written reasons.
BROWN, Chief Judge, concurs and dissents in part.
The WCJ ordered the surgery recommended by Dr. McHugh. Obviously, claimant would not be able to work during the surgery and recovery period. When he could return to work and what work he could do thereafter would be determined by the medical experts. (As footnoted in the majority opinion, claimant states in brief that he has undergone the surgery.) I respectfully dissent from the decision not to award TTD benefits. I concur in all other respects.
NOTES
[1] According to the claimant's brief, he has undergone surgery and is recuperating.
[2] Contra-see, e.g., Roberts v. Thibodaux Healthcare Center, XXXX-XXXX (La.App. 1st Cir.3/24/06), 934 So.2d 84, fn. 6; Angelle v. Taylor Oilfield, 2005-560 (La.App. 3d Cir.12/30/05), 918 So.2d 616.