980 So.2d 203 (2008)
CITY OF SHREVEPORT, Plaintiff-Appellant
v.
Theresa CASCIOLA, Defendant-Appellee.
No. 43,132-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 2008.
*206 Ronald F. Lattier, Curtis R. Joseph, Jr., Shreveport, for Appellant.
Mark K. Manno, for Appellee.
Before WILLIAMS, STEWART and PEATROSS, JJ.
WILLIAMS, J.
The city of Shreveport ("the City"), appeals an adverse judgment from the Office of Workers' Compensation ("OWC") awarding the claimant, Theresa Casciola, temporary total disability benefits and medical expenses. For the following reasons, we affirm the OWC's ruling.

FACTS
On May 9, 2003, while in the course and scope of her employment with the City, the claimant, a Sportran bus driver, was injured while securing a wheelchair onto a city bus. The claimant reported her injury to the City and began receiving medical treatment and indemnity benefits.
The claimant was initially treated at Willis Knighton WorkKare and was diagnosed with right shoulder sprain. Dr. Raymond Dennie, the physician who treated the claimant, released her to return to light duty work with no bus driving for two days. The claimant returned to driving on May 13, 2003 and complained that her pain had worsened. Dr. Dennie prescribed occupational therapy, light duty work with limited use of the right hand and arm, and no bus driving. On May 27, 2003, the claimant was released to return to work with the same restrictions. She was also referred to an orthopaedic physician.
On June 5, 2003, the claimant began treatment with Dr. Craig Springmeyer, an orthopaedic surgeon. She was treated with physical therapy and steroid injections for two weeks. When her condition did not improve, Dr. Springmeyer referred the claimant to Dr. Leigh Henderson, a physical medicine physician, for further evaluation.
The claimant was first seen by Dr. Henderson on July 15, 2003. Dr. Henderson treated the claimant with physical therapy and multiple pain medications. On July 30, 2003, Dr. Henderson noted that the claimant was on work restrictions and could not "use the right arm currently." An MRI was ordered which revealed a bulging disc at C6-7. Dr. Henderson referred the claimant to Dr. William Whyte, a pain specialist, for further evaluation.
On August 21, 2003, the claimant was seen by Dr. Karl Bilderback, an orthopaedic surgeon. Dr. Bilderback reviewed the claimant's MRI scan and noted that it did not reveal the source of her pain. Dr. Bilderback opined that the claimant had reached maximum medical improvement and had not suffered any permanent impairment as a result of her injury, noting:
While it may be uncomfortable for her to do so, I do not see any evidence that it would do her any damage to return to work. Due to the nature of her occupation, it would be reasonable for her to undergo a driving evaluation. . . .
The claimant was initially examined by Dr. Whyte on November 7, 2003. Dr. Whyte reviewed the claimant's MRI, EMG *207 and other medical records and opined that she was "suffering from right C7 chemical radicular pain." Dr. Whyte performed a series of nerve root blocks over the course of two months. When the claimant's condition did not improve, Dr. Whyte opined that she was at "maximum medical improvement" and recommended a functional capacity evaluation ("FCE") to ascertain her restrictions.
The FCE was conducted on January 15, 2004. The results revealed that the claimant had normal strength, motion and sensation in her right upper extremity and that the claimant's complaints of severe right shoulder pain appeared inconsistent. Paul Procell, the therapist who administered the FCE, opined that the claimant could return to her previous job without restrictions.
On January 20, 2004, Dr. Whyte released the claimant from his care and referred her back to Dr. Henderson. On February 4, 2004, Dr. Henderson referred the claimant to Dr. Marco Ramos, a neurosurgeon, for further evaluation.
The claimant was first examined by Dr. Ramos on March 29, 2004. Dr. Ramos deferred the claimant's return to work and recommended an electromyography ("EMG")[1] and nerve conduction studies of the claimant's upper extremities. Dr. Ramos also recommended a CT myelogram of the cervical spine,[2] which the City's insurer declined to authorize.
On June 6, 2004, Dr. J. Eric Bicknell, a physical medicine specialist, performed the EMG and nerve conduction studies, which were normal. On August 2, 2004, the claimant was examined by another neurosurgeon, Dr. Donald H. Smith, who was chosen by the City's insurer to render a second opinion and to ascertain whether the CT myelogram was necessary. Dr. Smith opined that the claimant needed no further active treatment and that she had reached maximum medical improvement. He also opined that the claimant was capable of returning "to a wide variety of work activities with no restrictions, including her previous work activities as a bus driver."
As a result of the differing opinions between Drs. Ramos and Smith, an independent medical evaluation ("IME") was performed by another neurosurgeon, Dr. Bernie G. McHugh. The claimant was first examined by Dr. McHugh on December 21, 2004. He agreed with the recommendation of a CT myelogram "to rule out any possible pathology that was not detected per MRI scan. . . ." Dr. McHugh also opined that the claimant could benefit from physical therapy, but the City's insurer refused to authorize the treatment.
On January 24, 2005, Dr. Ramos wrote the City's insurer, stating, "All the test[s] which have been done [do] not add any information to make the diagnosis. In view of this, I insist on having a CT myelogram of the cervical spine as recommended by the independent consultant. . . ."
The CT myelogram was performed on February 3, 2005 and revealed a "mild effacement of the anterior thecal sac at C5-6 and C6-7." A post-myelogram CT was obtained and revealed "mild degenerative disc disease at C4-5 and 5-6 without spinal stenosis or lateral stenosis" and "degenerative disc disease at C6-7 with subtle anterior cord contact by concentric disc bulge."
*208 On March 3, 2005, the claimant was examined again by Dr. Ramos, who noted that her "condition remains the same." She continued to report neck pain radiating to her right shoulder and right upper extremity. Dr. Ramos examined the claimant and noted limited range of motion in her cervical spine and tenderness in her muscles. Dr. Ramos reviewed the claimant's x-rays and noted "the cord contact is well defined at the level of C6-C7." Dr. Ramos recommended repeating the EMG and nerve conduction studies, but the City's insurer refused to authorize the tests.
By August 4, 2005, Dr. Ramos' notes revealed that the claimant's symptoms had expanded to include "numbness and tingling" in the fingers of her right hand and "in the ulnar aspect of the forearm." The claimant's physical examination revealed limited range of motion in her cervical spine and weakness in her right upper extremity. Dr. Ramos discussed various treatment options with the claimant, including surgery, and she elected to continue conservative treatment.
Dr. Ramos' notes from October through December 2005 revealed that the claimant's symptoms had not improved. By January 23, 2006, her limited range of motion had extended to the lumbosacral spine. Dr. Ramos recommended treating the claimant with an additional round of steroid injections. He stated, "If this fails to improve her condition, I will proceed with my original recommendation for surgical treatment."
On May 8, 2006, at the City's request, the claimant was examined again by Dr. Smith. Dr. Smith opined that she had reached maximum medical improvement and was "capable of performing a wide variety of work activities including those that she was performing prior to the injury." Dr. Smith also opined that there was "no indication for surgery to the neck or upper extremity area."
On May 10, 2006, the claimant was seen once more by Dr. Bilderback at the City's request. Dr. Bilderback examined the claimant and reviewed her imaging studies, including the CT myelogram. Dr. Bilderback opined that she was "able to return to work without significant restrictions." He opined that the claimant had reached maximum medical improvement and the "discomfort" caused by her work-related injury "should have resolved long ago."
On August 1, 2006, the claimant was examined by Dr. James Zum Brunnen, an orthopaedic surgeon. Dr. Zum Brunnen performed a physical examination, reviewed the claimant's medical records and ordered cervical spine x-rays. He reviewed the x-rays and noted a "mild narrowing at the C6-7 disc space." He recommended an "anterior cervical discectomy and interbody fusion with plate instrumentation at the C6-7 level." Dr. Zum Brunnen further opined, "I do not think she can work as a SporTran [sic] Bus Driver at this time and does not seem employable at any other occupation with the level of her pain that she is experiencing."
On November 14, 2006, the claimant underwent an independent medical evaluation by Dr. Robert Holladay, another orthopaedic surgeon. After examining the claimant and reviewing her medical records and x-rays, Dr. Holladay expressly disagreed with the opinions expressed by Drs. Ramos, McHugh, and Zum Brunnen. He agreed with Dr. Bilderback's opinion that the claimant was at maximum medical improvement. Dr. Holladay recommended conducting another FCE "followed by return to some type of gainful employment."
*209 On March 23, 2006, the City formally suspended the claimant's indemnity benefits, stating that she had been "released to return to full duty work." The claimant reconvened, seeking reinstatement of indemnity benefits and approval of cervical disc surgery.
Following a hearing, the workers' compensation judge ("WCJ") concluded that the claimant's work-related accident aggravated her pre-existing cervical disc disease and that the injury was compensable. The WCJ further ruled that the cervical disc surgery recommended by Dr. Ramos was reasonable and necessary medical treatment. The WCJ concluded that the claimant was temporarily, totally disabled and was entitled to temporary total disability ("TTD") benefits in the amount of $398.21 per week, based on claimant's average weekly wages of $597.28. The WCJ ordered the City to pay the benefits from the termination date through the date of trial, with legal interest from the date of judicial demand.

DISCUSSION
Temporary Total Disability Benefits
The City contends the claimant failed to meet her burden of proving that she is entitled to temporary total disability ("TTD") benefits. The City argues that the claimant failed to prove that she is unable to perform her job duties.
To obtain an award of TTD benefits, a claimant must prove by clear and convincing evidence, unaided by any presumption of disability, that she is physically unable to engage in any employment or self-employment. LSA-R.S. 23:1221(1)(c); Pardee v. Forest Haven Nursing Home, 42,321 (La.App. 2d Cir.6/20/07), 960 So.2d 1216; Brantley v. Delta Ridge Implement, Inc., 41,190 (La.App. 2d Cir.6/28/06), 935 So.2d 308. This is the standard of proof which a claimant must satisfy when he or she files a disputed claim form seeking an award of TTD benefits after the employer or insurer terminates voluntary payments of TTD benefits. Id.
The "clear and convincing" standard in a workers' compensation case is "an `intermediate' standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard." Hatcherson v. Diebold Inc., XXXX-XXXX (La.5/15/01), 784 So.2d 1284. To prove a matter by clear and convincing evidence, as required to establish entitlement to TTD benefits, means to demonstrate that the existence of a disputed fact is highly probable, i.e., much more probable than its nonexistence. Pardee, supra; Brantley, supra.
A claimant may prove disability through medical and lay testimony. Lewis v. Chateau D'Arbonne Nurse Care Center, 38,394 (La.App. 2d Cir.4/7/04), 870 So.2d 515. The WCJ must weigh all of the evidence to determine if the claimant has met her burden of proving temporary total disability. Id.; Atwood v. Ewing Timber, Inc., 34,045 (La.App. 2d Cir.12/15/00), 774 So.2d 1140, writ denied, XXXX-XXXX (La.5/11/01), 792 So.2d 733.
Whether the claimant has carried her burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ. Taylor v. Hollywood Casino, 41,196 (La.App. 2d Cir.6/28/06), 935 So.2d 293; Lewis, supra. Factual findings in workers' compensation cases are subject to the manifest error rule. Winford v. Conerly Corp., XXXX-XXXX (La.3/11/05), 897 So.2d 560; Brooks v. Madison Parish Service Dist. Hosp., 41,957 (La.App. 2d Cir.3/7/07), 954 So.2d 207, writ denied, XXXX-XXXX (La.5/18/07), 957 So.2d 155.
*210 Under the manifest error rule, the reviewing court does not decide whether the factfinder was right or wrong, but only whether its findings are reasonable. Winford, supra; Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La. 1993). When there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Id. Thus, even when the appellate court is convinced it would have weighed the evidence differently had it been sitting as trier of fact, the court of appeal may not reverse if the factfinder's findings are reasonable in light of the record reviewed in its entirety. Id.; Williams v. Saint Gobain Containers, 39,313 (La.App. 2d Cir.1/26/05), 893 So.2d 144.
In the instant case, the WCJ had the benefit of the claimant's extensive medical records, the claimant's testimony, as well as the reports and/or deposition testimony of the physicians who treated her. The claimant attempted to return to work after the incident, but the pain she suffered was too great to allow her to continue to work. Dr. Dennie released the claimant to return to light duty work, but her pain persisted.
The claimant testified that she persistently experienced "deep, deep throbbing burning type pain" in her neck, right shoulder and right arm. She stated that she was unable to work because of the constant pain. She further testified that she is unable to sit for extended periods of time, or to bend or lift anything.
Dr. Ramos, the claimant's treating neurologist, testified unequivocally that she "is not in condition to resume work activities" due to the pain and symptoms associated with the herniated disc in her cervical spine. Dr. Ramos stated that the claimant was a candidate for surgery because she had not responded to conservative treatment such as physical therapy, analgesics, muscle relaxants, anti-inflammatory medication and steroid injections.
In his deposition, Dr. McHugh testified that the claimant's work-related injury "aggravated or exacerbated" her degenerative disc condition. He further testified that he would not "feel comfortable" allowing a bus driver who is taking narcotics for pain, such as the claimant, to return to work. Dr. Zum Brunnen also opined that the claimant was unable to return to work as a bus driver and that she did not "seem employable at any other occupation with the level of her pain that she is experiencing."
In making his ruling, the WCJ stated:
[T]he Court finds no reason to deviate from the general rule that the testimony of Dr. Marcos Ramos, the treating physician, should be accorded greater weight than a physician who examines the patient only once or twice. . . .
Our review of the record reveals that Dr. Ramos has spent the most time treating the claimant since her injury. Dr. Ramos began treating her in March 2004 and has treated her continuously through the date of the trial. He has remained emphatic in his opinion that the claimant is unable to work. The claimant testified that she was frequently in pain, and the pain was only temporarily relieved by pain medication.
By contrast, the physicians who opined that the claimant is able to return to work have had only limited exposure to her. Dr. Dennie treated the claimant during the early stages of her injury, then referred her to Dr. Springmeyer, who treated her for approximately one month before referring her to Dr. Henderson. Dr. Henderson treated the claimant for approximately three months in 2003, then referred her to Dr. Whyte, who treated *211 her for approximately two months in 2003. During the course of the claimant's treatment with Dr. Henderson, she was examined twice by Dr. Bilderback. The claimant was also seen twice by Dr. Smith, once in 2004 and once in 2006.
After reviewing the record in its entirety, we conclude that the WCJ was not manifestly erroneous or clearly wrong in discounting the opinions of Drs. Whyte, Bilderback and Smith. Given the claimant's continued subjective complaints of pain and the objective evidence of the bulging cervical disc, we cannot say that the WCJ was manifestly erroneous in concluding the claimant was temporarily totally disabled as a result of her injury.
Medical Expenses
The City also contends the claimant failed to meet her burden of proving that the surgery recommended by Dr. Ramos was medically necessary. The City argues that Drs. Holladay and Smith recommended against surgery.
An employer is obligated to furnish all necessary medical expenses related to a work injury. LSA-R.S. 23:1203. A claimant may recover medical expenses that are reasonably necessary for the treatment of a medical condition caused by a work-related injury. Lewis, supra; Tatum v. St. Patrick's Psychiatric Hosp., 32,616 (La.App. 2d Cir.12/30/99), 748 So.2d 1276, writ denied, XXXX-XXXX (La.3/24/00), 758 So.2d 157. The employee must prove by a reasonable preponderance of the evidence the necessity and relationship of the physician's treatment to the work-related accident. LSA-R.S. 23:1203; Lewis, supra.
A WCJ's determination with regard to medical necessity is entitled to great weight and will not be disturbed on appeal in the absence of manifest error or unless clearly wrong. Spence v. Industrial N.D.T., 31,744 (La.App. 2d Cir.3/31/99), 731 So.2d 473. In that regard, it is the function of the WCJ to assess the weight to be accorded to both the lay and medical testimony, and the court may accept or reject the opinion of a medical expert, depending upon what impressions the qualifications, credibility and testimony of that expert make on the court. Id.; Davison v. Horseshoe Casino Inc., 31,166 (La. App. 2d Cir.10/28/98), 720 So.2d 785, writ denied, 98-2950 (La.1/29/99), 736 So.2d 833.
In this case, the claimant's initial physical examination and diagnostic studies did not reveal any significant cervical disc disease and did not suggest a cause for claimant's continued pain. Therefore, conservative treatment was indicated. An MRI performed approximately two months after the injury revealed a bulging cervical disc and the claimant was treated with nerve root blocks. Finding the claimant's continued complaints of pain to be reliable, Dr. Ramos ordered another MRI, as well as an EMG, nerve conduction studies and a CT myelogram. The MRI and CT myelogram showed degenerative disc disease and a bulging disc at C6-7. Dr. Ramos, the claimant's treating neurologist, opined that she needed surgery to relieve compression on her spinal cord.
The claimant was treated with therapy and various medications for over a year and her condition did not improve. In August 2004, Dr. Ramos suggested surgery but the claimant expressed her desire to continue conservative treatment, which was continued without results. Dr. McHugh opined that the claimant could benefit from physical therapy. After undergoing physical therapy for several months, the claimant's symptoms did not improve. Dr. Ramos remained adamant in his position that surgery was indicated since the claimant's condition had not improved *212 with treatments such as analgesics, muscle relaxants, anti-inflammatory medication and physical therapy.
In her ruling, the WCJ stated:
Dr. Ramos' deposition testimony played a large role in this Court's decision regarding the issue of surgery. He was persuasive in his testimony regarding the CT myelogram, what the CT myelogram demonstrated. . . .
* * *
Dr. Ramos also noted that her grip was weaker on the right, and this is supported by the data elicited in the FCE report that was introduced into evidence. The IME, the deposition of Dr. [McHugh], a neurosurgeon, confirmed the findings of the CT myelogram and the probable source of the claimant's complaints. . . .
Dr. Zum Brunnen's physical findings corroborated the findings of cervical disc surgery.
* * *
Despite the contrary opinions of Drs. Holladay and Bilderback, we find no manifest error in the WCJ's conclusion that surgery was necessary for the treatment of claimant's medical condition.
Fraud
The City also contends the WCJ committed manifest error in failing to apply the provisions of LSA-R.S. 23:1208. The City argues that a few days prior to trial, it learned that the claimant was treated for neck and back pain from 1999 until 2002. The City argues that the claimant committed fraud by failing to disclose prior treatment of back pain. The City further contends it is entitled to restitution under LSA-R.S. 23:1208(D).
LSA-R.S. 23:1208 provides in pertinent part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
* * *
D. [A]ny person violating the provisions of this Section may be assessed civil penalties by the workers' compensation judge . . . and may be ordered to make restitution. Restitution may only be ordered for benefits claimed or payments obtained through fraud and only up to the time the employer became aware of the fraudulent conduct.
E. Any employee violating this Section shall, upon determination by [the] workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
LSA-R.S. 23:1208 applies to any false statement or misrepresentation, including one concerning a prior injury, made specifically for the purpose of obtaining workers' compensation benefits and therefore, generally becomes applicable at the time of an employee's accident or claim. Resweber v. Haroil Const. Co., 94-2708 (La.9/5/95), 660 So.2d 7; Harris v. Bancroft Bag, Inc., 30,431 (La.App. 2d Cir.4/9/98), 714 So.2d 44. This statute encompasses false statements or misrepresentations made to anyone, including the employer, physicians or insurers, when made willfully or deliberately for the purpose of obtaining benefits. Harris, supra; J.E. Merit Constructors, Inc. v. Butler, 97-361 (La.App. 5th Cir.9/30/97), 700 So.2d 1111.
Forfeiture of benefits is authorized upon proof that (1) there is a false statement or representation; (2) it was *213 wilfully made; and (3) it was made for the purpose of obtaining or defeating any benefit or payment. Resweber, supra; Howard v. Holyfield Constr., Inc., 36,734 (La. App. 2d Cir.3/18/03), 839 So.2d 1277, writ denied, XXXX-XXXX (La.6/6/03), 845 So.2d 1097. All three requirements must be present before a claimant can be penalized. Harris, supra.
Forfeiture is a harsh remedy and must be strictly construed. Wise v. J.E. Merit Constructors, Inc., 97-0684 (La.1/21/98), 707 So.2d 1214; Johnikin v. Jong's, Inc., 40,116 (La.App. 2d Cir.9/21/05), 911 So.2d 413, writ denied, 2005-2251 (La.2/17/06), 924 So.2d 1020. Nevertheless, the WCJ's decision to impose or deny forfeiture under § 1208 is a factual finding which will not be disturbed on appeal absent manifest error. Johnikin, supra.
In the instant case, the City introduced the claimant's medical records from her primary physician, Dr. Larry Flake. The records reveal that the claimant placed a call to Dr. Flake's office on January 27, 2000, complaining of pain in her head, neck and lower back. Dr. Flake prescribed Skelaxin, a muscle relaxant, and referred the claimant to orthopaedic surgeon, Dr. Harold Bicknell, who injected her with Norflex and placed her on Medrol and Lortab.
The claimant was seen by Dr. Flake on May 9, 2000 with complaints of neck pain but no treatment was ordered at that time. On October 30, 2001, she presented to Dr. Flake, complaining of pain in her lower back. Dr. Flake continued the Lortab. On February 20, 2002, the claimant was again seen by Dr. Flake with complaints of pain in her neck and mid-back over the course of several months. This time, physical therapy was prescribed. After completing physical therapy, the claimant was seen by Dr. Flake on March 12, 2002, still complaining of neck and back pain. Muscle relaxants were continued and a cervical collar was ordered. The claimant's medical records do not indicate any further complaints of neck or back pain until the accident at issue, over one year later.
During her testimony on cross-examination, the claimant admitted that she had been treated for headaches and neck pain prior to the accident at issue and that she had undergone physical therapy. She also stated that she did not inform the physicians who treated her for the current injury of her prior neck and back pain because she "did not feel like that was nothing to do with the injury." The claimant explained that she had a history of migraine headaches, as a result of stress. She further explained that the neck pain, which radiated to her back, was associated with the headaches.[3] After reviewing the evidence submitted, the WCJ expressly rejected the City's allegations of fraud, stating:
I do not find that the claimant committed fraud in connection with her testimony at trial, deposition, or statements to the doctors. The records reflect neck complaints that do not extend into her shoulder, arms and hands, as she complains of following the May 8, 2003 accident.
* * *
The prior medical records demonstrate a preexisting condition and increase of symptomology since her accident. . . .
*214 The WCJ heard the evidence and weighed the credibility of the witnesses. Apparently, the WCJ found the claimant's testimony credible and accepted her explanation for failing to inform her treating physicians of her prior treatment for neck and back pain. After considering all of the evidence and facts surrounding the case, the WCJ found that the claimant's failure to disclose information with regard to prior neck and back pain was not a deliberate misrepresentation made for the purpose of obtaining workers' compensation benefits. After reviewing the record, we cannot say that the WCJ was clearly wrong in finding that the claimant did not violate the provisions of LSA-R.S. 23:1208.

CONCLUSION
For the foregoing reasons, the judgment of the Office of Workers' Compensation is affirmed. The costs of this appeal are assessed to the city of Shreveport.
AFFIRMED.
NOTES
[1] EMG is a technique for evaluating and recording the physiologic properties of muscles.
[2] A myelogram uses dye and x-ray to make pictures of the bones and the spaces between the bones of the spine.
[3] The claimant's records from Dr. Flake's office reveal that she had been frequently treated for severe headaches.