709 So.2d 986 (1998)
Betty GREIS, Plaintiff-Appellant,
v.
LAKE CHARLES MEMORIAL HOSPITAL, Defendant-Appellee.
No. 97-1258.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1998.
Writs Denied May 15, 1998.
Betty Greis, pro se.
Brian Lee Coody, Lake Charles, for Lake Charles Memorial Hospital.
Michael Benny Miller, Crowley, pro se.
Before DECUIR, AMY and PICKETT, JJ.
*987 AMY, Judge.
In this workers' compensation matter, the claimant, Betty Greis, seeks reinstatement of disability benefits terminated by her employer, Lake Charles Memorial Hospital. Following a hearing, the workers' compensation judge ruled in favor of the hospital after finding the claimant had not proven her entitlement to benefits, but ordering her employer to provide medical expenses incurred as a result of the work-related injury. The claimant now appeals. We affirm.

Facts and Procedural History
The claimant, Betty Greis, contends that she was injured as the result of a fall which occurred at her place of employment, Lake Charles Memorial Hospital, on June 21, 1988. Greis, who was employed by the defendant as an instrument and x-ray technician, maintains that the accident occurred when she entered a room adjacent to a surgical suite and slipped on alcohol that had been spilled onto the floor. She asserts that, upon falling, she hit the right side of her head on a steel sink and that she fell on her right shoulder, arm, and hand. After being helped to her feet by a nurse, the claimant's wrist began to swell and she sought treatment in the hospital's emergency room. X-rays performed soon thereafter revealed no fracture of the wrist. Greis testified that her wrist was placed in a splint and she was ordered to light-duty work for four days. However, Greis was informed that she should stay at home during that period as there was no light-duty work available.
After returning to work, the claimant found her duties difficult to perform and ultimately ceased working. The defendant began providing Greis with temporary total disability payments in July 1988. Additionally, the defendant provided the claimant with medical treatment related to the accident. Over the course of the next several years, the claimant sought the assistance of over thirty doctors.
The claimant asserts that the work-related accident caused various medical problems, including reflex sympathy dystrophy disorder, right brachial plexus, and carpal tunnel syndrome. Greis maintains that, because of these injuries, she experiences daily pain which renders her unable to work.
The record reflects that because of the reflex sympathy dystrophy, which was diagnosed soon after the fall, the claimant underwent a right transthoracic dorsal sympathectomy in April 1989. The surgery apparently provided the claimant with some relief. As for the carpal tunnel syndrome complained of by Greis, Dr. Louis Blanda, an orthopaedic surgeon, performed a right carpel tunnel release, as well as a manipulation of the right shoulder in December 1989. Despite having these surgeries performed and initial reports indicating that her pain had lessened, the claimant continued to complain of pain and, as the record reflects, these complaints increased. Greis sought treatment from various specialists reporting wide-ranging symptoms. The defendant paid both medical treatment and disability benefits until terminated on December 12, 1992. Thereafter, the defendant paid some of the medical payments until 1995, namely those of Dr. Keith Nabours, a psychiatrist, and a neurologist of the claimant's own choosing, Dr. James Domingue. The adjuster handling Greis' claim testified that the disability benefits were terminated after the defendant received medical reports indicating that Greis could return to work and that "whatever limitations she had at that time would not interfere with her going back to work." Additionally, the defendant was informed by the daughters of Greis' live-in boyfriend that Greis was able to perform household functions.
After receiving this information that Greis could possibly return to work, and before terminating benefits, the defendant attempted to have the claimant participate in a functional capacity evaluation as recommended by one of her doctors. However, the claimant refused to do so. Thereafter, the defendant obtained job evaluations from Dr. Domingue and Dr. Nabours who approved the described job. This position was ultimately offered to the claimant, was inside the guidelines of her previous position as an instrument technologist, and offered the same rate of pay as her pre-accident job. The claimant, however, never reported to work for this new position.
*988 Greis filed a Disputed Claim for Compensation in February 1993. Although represented by various attorneys throughout the history of the claim, Greis appeared before the court in proper person at the hearing held on this matter. Following three days of trial, at which the plaintiff presented an abundance of medical reports and information, the workers' compensation judge entered judgment in favor of the defendant and found that the defendant had not acted arbitrarily and capriciously in handling the claim. The judge also ordered that the defendant continue to pay for any medical treatment stemming from the work-related injury. The claimant now appeals.
Additionally, Michael B. Miller, the claimant's attorney during two different periods in the history of this claim has answered the appeal and argues that the case should be remanded as he was not notified of the hearing date despite having filed a Petition for Intervention to protect his interest in any attorney's fees.

Discussion

Disability Benefits
The claimant, who continues as her own counsel, argues that the workers' compensation judge erred in denying her request for benefits. Greis asserts that various evidence presented by the defendant and, in turn, relied upon by the workers' compensation judge is fabricated and misleading as to her condition. She asserts that she is still disabled and in almost constant pain.
It is not clear whether the plaintiff is seeking temporary or permanent disability benefits, however, under either, a claimant must offer clear and convincing evidence that he or she is unable to engage in any type of employment.[1]See La.R.S. 23:1221(1)[2]; La. R.S. 23:1221(2). In order to meet this clear and convincing standard, a claimant must introduce objective medical evidence. Comeaux v. Sam Broussard Trucking, 94-1631 (La.App. 3 Cir.App. 5/31/95); 657 So.2d 449.
The Louisiana Supreme Court has established the standard of review which must be employed following a determination of whether the claimant has met the required burden. In Bailey v. Smelser Oil & Gas, Co., 620 So.2d 277, 280 (La.1993), the court stated as follows:
The trial court must weigh all the evidence, medical and lay, in order to determine if the plaintiff has met his burden. Simpson v. S.S. Kresge Co., 389 So.2d 65 (La.1980). This factual finding should be given great weight and should not be overturned absent manifest error. Prim, [v. City of Shreveport, 297 So.2d 421 (La. 1974)], supra; Johnson v. Ins. Co. of N. America, 454 So.2d 1113 (La.1984). See, also, Thomas v. Highlands Insurance Company, 617 So.2d 877 (1993).
In the present case, the workers' compensation judge determined that the claimant *989 did not meet this burden. In reasons for ruling, the workers' compensation judge briefly reviewed the medical evidence entered into the record and reasoned as follows:
Based on the medical evidence above as well as other relevant evidence in the record, the overwhelming weight of the evidence indicates claimant has failed to maintain her burden of proving she is entitled to workers' compensation indemnity benefits resulting from the 1988 accident. The claimant must introduce objective medical evidence to carry her burden of proving disability by clear and convincing evidence. LSA-R.S. 23:1221; Comeaux v. Sam Broussard Trucking, 657 So.2d 449 (La.App. 3 Cir. 5/31/95). She has been unable to do so. Claimant has numerous subjective symptoms. There is numerous medical evidence some differing as to the extent, cause or duration of the injury sustained by claimant. However, the record is void of evidence that the work injury would prevent claimant from returning to work. Even allowing for the resolution of all credibility calls in claimant's favor, the evidence in this record lacks the requisite medical corroboration that claimant's 1988 work injury is currently disabling. This Court cannot simply accept claimant's testimony that she cannot work merely because she believes she cannot work. This matter came for trial for three non-consecutive days and claimant represented herself. She participated in the entire proceedings handling documents and questioning witnesses in an extremely normal fashion. Although she wore a hand brace, she did not exhibit the features of a physically handicapped individual, and while she was at times emotional, she was able to maintain control of herself.
A claimant who incurs medical and travel expenses for the treatment of work-related injury is generally entitled to recover those expenses from her employer, even if the injury is not disabling and that is the case here. Claimant is entitled to medical expenses relating to her work accident.
After our review of the record, which is replete with medical reports and opinions of the many doctors visited by Greis, we find no error in this determination.
Like the workers' compensation judge, we will not detail the copious medical information submitted in this matter. Rather, in review, we focus on the reports and opinions central to the parties' arguments. In an attempt to meet the burden required of her, the claimant entered into evidence reports of some of the thirty-two doctors visited during the course of her treatment. A majority of these doctors were apparently of the claimant's own choosing. One of those rendering the results most favorable to her argument was Dr. Peter Dorsher, a physiatrist who first saw Greis in June 1993. One of these reports, dated June 8, 1993, indicates that Dorsher diagnosed "fibromyalgia with superimposed depression." In his deposition, which was presented by the defendant, he testified that the claimant reported to him complaining of widespread pain. Dr. Dorsher stated that although he diagnosed the claimant as suffering from fibromyalgia, his examination revealed no reflex sympathetic disorder nor brachial plexopathy. Dr. Dorsher stated that the claimant's pain was reduced due to a stay in a pain management program in September and October 1993. As for his diagnosis of fibromyalgia, he testified that it was difficult to know whether it was caused by the claimant's work-related accident in 1988, but that she did tell him that the onset of the widespread pain was concurrent with the fall. Although the claimant tested positive for several of the Waddell's signs, signs which indicate the possibility of malingering, Dr. Dorsher testified that he had no reason to believe that Greis was, in fact, malingering. When asked whether she could return to work, Dr. Dorsher stated that he thought the probability was low given the amount of time she had been on disability.
The claimant also introduced the report of Dr. R. Dale Bernauer who examined her in October 1992 for a social security disability claim. In this report, Dr. Bernauer found that the claimant had brachial plexus injury and possibly ulnar nerve lesion and reflex sympathy dystrophy. Despite these findings, he suggested only that: "She should not use the right hand for heavy work. Otherwise *990 she should be able to work." Additionally, Greis presented the April 1991 report of Dr. Fred C. Webre, an orthopaedic surgeon who also performed an examination for the social security determination. Dr. Webre's report indicates that the following evaluation was made:
This patient has had several diagnoses. She was said to have a reflex sympathy dystrophy. If she did, it surely improved. She has some diminished strength in the right hand as compared to the left, and, on that basis, would be unable to do any heavy straining more than 20 to 25 pounds with this right hand at present. She may have difficulty working at or above shoulder level because she has not used this extremity for a long period of time. With more active usage, however, would become more functional. She does not have any reflex changes or any sensory or circulatory deficit in the upper or lower extremities.
Much of the medical evidence presented by the plaintiff were reports from 1988 and 1989 at which time the claimant underwent surgery for both reflex sympathy disorder and carpal tunnel syndrome and, as indicated above, obtained some relief. Therefore, this evidence has little relevance as it relates to earlier injuries for the claimant received benefits and which, as explained below, was apparently resolved before benefits were terminated. Furthermore, the reports of Dr. Dorsher and Dr. Bernauer, in addition to various other medical evidence, do not establish, clearly and convincingly, that the claimant cannot return to any type of work. Rather, these above-mentioned reports and others reveal that the claimant continued to report varying degrees of pain and ailments, but that, other than Dr. Dorsher, she has not been told that she cannot work. These reports are countered against the voluminous medical reports presented by the defendant.
Soileau, the claims adjuster previously mentioned, testified that, in terminating the claimant's benefits, the company relied on the reports of the claimant's neurologist, Dr. Domingue. He appears to have treated the claimant for the longest period of time of any of the physicians rendering medical care to the plaintiff. His report of the claimant's September 18, 1992 visit indicates the following:
The patient has multiple somatic complaints with an essentially normal examination. I think that one can see some residual discomfort in an area that has experienced a reflex sympathetic dystrophy despite a normal examination. In addition, some neck discomfort in the patient and possibly even some residual headache would not be unexpected findings. However, I told the patient that I cannot relate any other complaints to her original injury nor to neurological dysfunction. Furthermore, even in the right arm, neck, and head, I am surprised at the magnitude of the discomfort given the normal examination. I, frankly, think something else is going on here. I do not have Dr. Nabours' opinion regarding the possibility of conversion reaction and emotional exaggeration of symptoms, and I think his opinion would be crucial to include or exclude a psychiatric explanation. There are several other disorders that may present as multi-focal pain in an adult such as rheumatoid arthritis, hyothryroidism, several of the connective tissue disorders, etcetera. I am suggesting via this letter to Dr. Kang[3] that these things be looked for. I could relate none of these things to her injury.
Following this evaluation, Dr. Domingue opined that: "Neurologically, there is nothing else to offer this patient." He advised that she see Dr. Philip Osborne for employment evaluation. However, the claimant did not follow through with this recommendation. Additionally, after reviewing a job description of the job offered to the claimant, Dr. Domingue agreed that the claimant could perform the position as described.
The defendant also submitted the reports of the claimant's psychiatrist, Dr. Keith Nabours wherein he opined that she could return to work from a psychological point-of-view and, in fact, stated that such a return would be therapeutic. Like Dr. Domingue, Dr. *991 Nabours reviewed a job description of the position offered the claimant and reported finding nothing in the description that "Greis' emotional condition would prevent her from doing."
Our review of the remaining medical reports reveals additional medical opinions rebutting the claimant's view that she cannot return to work. For example, Dr. Donald Richardson, a neurologist at the Tulane Medical Center, testified by deposition that he found no basis for her complaints and no reasons for her not to return to work. Additionally, following a November 17, 1992 evaluation by Dr. Steven Snatic, a neurologist, Dr. Snatic opined that the examination revealed no neurological deficit and that the claimant "is no longer totally disabled."
After reviewing the above referenced reports, along with the various other reports and information contained within the record, we do not conclude that the workers' compensation judge was manifestly erroneous in finding that the claimant failed to meet the requisite burden of proof required for recovery of benefits. Accordingly, the claimant's argument is without merit.

Intervention
Greis' former counsel, Michael B. Miller, answered the claimant's appeal and asks this court to remand the matter as he did not receive notice of the hearing date. He asserts that, had such notice been given, many of the arguments he would have made to protect his interest in attorney's fees would have been to Greis' benefit as she was representing herself.
The record now before us does not indicate that the intervenor, Miller, filed a request for notice of trial date at the time the Petition for Intervention. Rather, the petition, which was filed at the time the parties were thought to have reached a settlement, contains the following:
Intervenor adopts the petition of Betty Greis as against the defendant, Lake Charles Memorial Hospital, pleads said petition its entirety.
WHEREFORE, INTERVENOR PRAYS that a copy of this petition of intervention be served upon BETTY GREIS and LAKE CHARLES MEMORIAL HOSPITAL, and that after due proceedings had, there be judgment in favor of the intervenor, and against BETTY GREIS and LAKE CHARLES MEMORIAL HOSPITAL, in a reasonable amount, together with legal interest from date of judicial demand until paid, and for all costs of this proceeding.
Following this petition, a hearing on the intervention was held at which Miller presented evidence related to his time spent on the case prior to his dismissal. The workers' compensation judge took the matter under advisement and the settlement was never finalized. As such, the judge never ruled on the settlement. Afterwards Miller re-entered the case as Greis' counsel, but, once again, withdrew. He now argues that he should have received notice of the hearing date based on this original Petition for Intervention. We do not agree.
Not only did Miller not file a request for notice of the hearing's date, but the claimant in this case was ultimately unsuccessful in her suit against the defendant. It was only in the event that she recovered that the intervenor would have a property right in the matter and a need to protect that right. See Legros v. Westlake Polymers Corp., 97-579 (La.App. 3 Cir. 12/10/97) 704 So.2d 876. In fact, this occurred initially when all parties believed that a settlement had been reached. The intervenor had his day in court at that time, when it was appropriate. No such hearing is now required as Greis was not awarded any judgment in which the intervenor now has a property interest.
Neither do we find persuasive the intervenor's assertion that the presentation of his claim would have assisted Greis in the main demand. Had he been allowed to present evidence, such a showing would have been limited to the intervention and attorney's fees incurred. Accordingly, Greis' case-in-chief would remain unchanged. We find this argument without merit.

DECREE
For the foregoing reasons, the decision of the Office of Workers' Compensation is affirmed. Costs of this appeal are to be divided *992 between the claimant, Betty Greis, and the intervenor, Michael B. Miller.
AFFIRMED.
NOTES
[1] Although the record does not clearly indicate the type of benefits sought by the claimant, it does not appear that supplemental earnings benefits are sought as the claimant is steadfast in her argument that she is unable to perform any type of work whatsoever.
[2] The provision setting forth the requirements for recovery of temporary total disability benefits is found at La.R.S. 23:1221(1) and provides, in part, as follows:

(1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
....
(c) For purposes of Subparaph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
This provision is substantially the same as La. R.S. 23:1221(2) which contains the provision for recovery of permanent total disability benefits.
[3] The record indicates that Dr. Young H. Kang is the claimant's general practitioner.