GASKINS, J.
 

 Lin these four consolidated appeals, the claimant, Judith Frye, argues that the workers’ compensation judge (WCJ) erred in denying her claims for more medical and indemnity benefits for two separate work-related injuries. We affirm the ruling of the WCJ.
 

 FACTS
 

 In September 2001, the claimant, a photography assistant in the church directory division of Olan Mills, was injured when a door struck her right heel while she was working. She received medical and indemnity benefits but eventually resumed her job. In April 2004, the claimant filed a disputed claim for compensation with the Office of Workers’ Compensation (OWC) pertaining to this incident; she requested medical treatment and compensation. The employer filed an answer and exception in which it admitted a work-related accident but denied an injury.
 

 In May 2004, the claimant was at a church working on them directory when she had to descend some stairs with a cart. She lost her balance and had to grab the cart to try to stop it from falling. She did ■not fall or hit the wall. In November 2004, the claimant filed a disputed claim for compensation with the OWC for this accident; according to the claimant, she injured her “right upper extremity.”
 
 [1]
 
 In its answer, the employer denied a work-related accident or the employee’s entitlement to compensation or treatment. In January 2005, this matter was consolidated with the claim for the September 2001 incident.
 

 lain April 2006, the claimant filed an amended claim in which she requested penalties and attorney fees and asserted that the “accident caused aggravated or made pre-existing condition worse [sic].” In its answer, the employer denied that the claimant was entitled to any additional benefits, penalties or attorney fees. Yet another amended disputed claim for compensation was filed in May 2006. In response, the employer asserted that the claimant’s problems had resolved as of November 26, 2002, for the first injury and September 24, 2005, for the second one. In September 2006 and February 2007, the claimant filed additional disputed claims for workers’ compensation asserting the same two injuries. By joint motion, all of the claims were consolidated in May 2007.
 

 Trial was held in July 2007. The claimant was the only witness to testify in person. Among the evidence introduced at trial were the claimant’s medical records and the depositions of two doctors. The medical records showed that the claimant suffered from a myriad of medical conditions (including diabetes, osteoarthritis, diverticulitis, hyperthyroidism, hypertension, and cardiac problems) that were unrelated
 
 *204
 
 to her work injuries. The claimant was repeatedly confronted by her medical records in which her physicians concluded that while she suffered injuries in the work-related accidents, the injuries eventually resolved and she was able to return to work at full duty; she generally denied awareness of this information. The claimant’s testimony was often confusing and contradictory. At various points, she admitted that she did not injure her left hand in the second accident; at others, she asserted that she hurt both hands. At |3the end of her testimony, the employer orally moved to amend its pleadings to include a violation of La. R.S. 23:1208, which provides for forfeiture of benefits due to wilful misrepresentations.
 

 On November 14, 2007, the WCJ issued oral reasons for judgment. The WCJ found that the claimant failed to meet her burden of proof to show that she was entitled to any further indemnity or medical benefits as a result of her work-related accidents on September 7, 2001, and May 24, 2004. The WCJ further noted that it was “highly improbable” that the disability she was claiming had been caused by either work-related accident. According to the WCJ, the claimant’s testimony was so inconsistent and lacking in veracity that it did not aid her case. Accordingly, the WCJ dismissed her claims with prejudice at her cost. However, the WCJ denied the employer’s request to find that the claimant violated La. R.S. 23:1208; it declined to find that she made deliberate misrepresentations to obtain workers’ compensation benefits. Judgment was signed December 3, 2007. The claimant’s motion for new trial was denied in January 2008; that judgment was signed February 29, 2008.
 

 The claimant appealed. She filed a motion to present evidence in this court; we denied the motion in January 2009 on the grounds that many of the documents she submitted were already in the record and that as a court of review we do not consider new evidence.
 

 LAW
 

 An employee is entitled to compensation benefits if she receives a personal injury by an accident arising out of and in the course of her 14empIoyment. La. R.S. 23:1031. The employee has the burden of proving, by a preponderance of the evidence, that her disability is related to an on-the-job injury.
 
 Anthony v. BE & K Construction, 32,729
 
 (La.App. 2d Cir.5/10/00), 760 So.2d 608,
 
 writ denied,
 
 2000-1673 (La.9/15/00), 768 So.2d 1280.
 

 Under the provisions of La. R.S. 23:1221(3)(a), an employee is entitled to receive supplemental earnings benefits (SEBs) if she sustains a work-related injury that results in her inability to earn 90 percent or more of her average pre-injury wage. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in her inability to earn that amount under the facts and circumstances of the individual case.
 
 Smith v. Bossier Parish School Board,
 
 39,590 (La.App. 2d Cir.4/6/05), 899 So.2d 747,
 
 writ denied,
 
 2005-1199 (La.11/28/05), 916 So.2d 147.
 

 A workers’ compensation claimant seeking temporary or permanent total disability benefits bears the burden of proving, by clear and convincing evidence, her inability to engage in any type of employment.
 
 Greis v. Lake Charles Memorial Hospital,
 
 1997-1258 (La.App. 3d Cir.3/6/98), 709 So.2d 986,
 
 writs denied,
 
 1998-0937 & 1998-0939 (La.5/15/98), 719 So.2d 467.
 

 Under La. R.S. 23:1203, medical payments are separate and distinct from compensation indemnity benefits. A work
 
 *205
 
 ers’ compensation claimant may recover medical expenses that are reasonably necessary for the treatment of a medical condition caused by a work-related injury. The | ¡^plaintiff must prove the necessity of the treatment and the causal connection between the treatment and the employment-related accident by a preponderance of the evidence.
 
 Taylor v. Wal-Mart Stores, Inc.,
 
 40,179 (La.App. 2d Cir.9/21/05), 914 So.2d 579,
 
 writ not considered,
 
 2006-0144 (La.4/17/06), 926 So.2d 500,
 
 cert. denied,
 
 549 U.S. 1157, 127 S.Ct. 982, 166 L.Ed.2d 783 (2007).
 

 Whether the claimant has carried her burden of proof and whether testimony is credible are questions of fact to be determined by the WCJ.
 
 Taylor v. Hollywood, Casino,
 
 41,196 (La.App. 2d Cir.6/28/06), 935 So.2d 293;
 
 City of Shreveport v. Casciola,
 
 43,132 (La.App. 2d Cir.3/26/08), 980 So.2d 203. Factual findings in workers’ compensation cases are subject to the manifest error rule.
 
 Winford v. Conerly Corporation,
 
 2004-1278 (La.3/11/05), 897 So.2d 560;
 
 City of Shreveport v. Casciola, supra.
 

 Under the manifest error rule, the reviewing court does not decide whether the factfinder was right or wrong, but only whether its findings are reasonable.
 
 Winford, supra; Stobart v. State, Department of Transportation and Development,
 
 617 So.2d 880 (La.1993). The manifest error standard applies even when the workers’ compensation judge’s decision is based upon written reports, records or depositions.
 
 Bruno v. Harbert International, Inc.,
 
 593 So.2d 357 (La.1992);
 
 Alexander v. Brookshire Grocery Company,
 
 42,855 (La.App. 2d Cir.1/9/08), 975 So.2d 100,
 
 writ denied,
 
 2008-0503 (La.4/25/08), 978 So.2d 367.
 

 When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon preview, even though the appellate court may feel its own inferences and evaluations are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the factfin-der’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart, supra; Winford, supra.
 

 As a general rule, the testimony of a treating physician should be accorded greater weight than that of a physician who examines a patient only once or twice. However, the treating physician’s testimony is not irrebuttable, and the trier of fact is required to weigh the testimony of all medical witnesses.
 
 Mosley v. Pennzoil Quaker State,
 
 37,199 (La.App. 2d Cir.7/23/03), 850 So.2d 1100,
 
 writ denied,
 
 2003-2412 (La.11/21/03), 860 So.2d 553.
 

 An independent medical examiner (IME)’s medical conclusions should be given significant weight because the IME is an objective party. Nevertheless, the opinion of the IME is not conclusive and the WCJ must evaluate all of the evidence presented in making a decision as to a claimant’s medical condition.
 
 Mosley, supra.
 

 While the treating physician’s testimony is normally given substantial weight, the court-appointed expert’s opinion must be considered as
 
 prima facie
 
 evidence of the facts therein stated. La. R.S. 23:1123;
 
 Fritz v. Home Furniture-Lafayette,
 
 95-1705 (La.App. 3d Cir.7/24/96), 677 So.2d 1132.
 

 LMEDICAL EVIDENCE
 

 Foot injury
 

 Following the September 2001 door accident, the claimant was treated by Dr. Don Burt of the Bone and Joint Clinic about a
 
 *206
 
 week after the incident. He found evidence of contusion with no indication of a permanent disability; he stated that she should be able to return to work within four days of seeing him.
 

 She later saw her internal medicine doctor, Dr. Leslie Sewell, in mid-to-late 2002. Dr. Sewell’s impression was that the claimant had diabetes mellitus with mild peripheral neuropathy of her right foot; the doctor sought to educate her on diabetic foot disease.
 
 [2]
 

 Dr. Sewell referred the claimant to Southside Foot Clinic in June 2002. She was placed in a cast boot which was initially beneficial. Dr. Richard Havens, a podiatrist, referred her to Dr. James Lillich, an orthopedic specialist.
 

 In September 2002, Dr. Lillich of Orthopedic Specialists of Louisiana examined the claimant to give a second opinion as to her right foot; his impressions were post contusion of the Achilles tendon insertion with probable mild tendonosis and equinus contracture of the foot with weakness of the anterior leg musculature. He recommended physical therapy. On October 9, 2002, she saw another doctor in that practice, Dr. G. Michael | sHaynie, who told her she could return to work as long as she continued physical therapy.
 

 In November 2002, Dr. Jenness Courtney, III, of Northwest Louisiana Physical Medicine, noted an unremarkable MRI when he saw the claimant for right heel pain and ankle weakness secondary to a contusion injury. An EMG exam conducted then showed an old peroneal mononeu-ropathy on the right, which was resolving. He recommended physical therapy for a month. In December 2002, Dr. Courtney signed a report attesting that the claimant was at maximum medical improvement (MMI) and capable of returning to work.
 

 Also in November 2002, the claimant was treated by Dr. Gordon Mead, who diagnosed a contusion of the right heel; he believed her recovery was prolonged by an old peroneal nerve injury. He agreed with a course of physical therapy for six to eight weeks, after which she should be at MMI. He opined that she could return to work which did not involve standing, climbing or jumping. He did not believe that her peroneal nerve problem had anything to do with her work-related injury. A physical therapist note from Willis Knighton dated November 12, 2002, stated that the claimant was physically able to return to work, but had not.
 

 In January 2003, Dr. Sewell referred the claimant to Dr. Mary McWilliams, a board-certified neurologist. She diagnosed the claimant as suffering from bursitis in her right heel; she also had bilateral muscle contracture, or shortening of the muscles, in her calf muscles which the doctor described as being the result of a longstanding lack of exercise and |8was not related to her 2001 injury. While she did not consider the claimant to be at MMI on January 16, 2003, Dr. McWilliams agreed with Drs. Courtney and Mead that her peroneal mononeuropathy was not a result of the work injury. She also concluded that the claimant was capable of returning to regular job duties. Dr. McWilliams was unable to relate the bursitis to her work injury, noting that bursitis can develop in anyone. When she saw the claimant on January 28,
 
 *207
 
 2003, she noted that her complaints were out of proportion to the doctor’s findings. By the time of her appointment on February 10, 2003, the claimant was pain free and displayed no evidence of injury. In a report Dr. McWilliams completed in July 2003, she stated that the claimant was at MMI and completely released from care due to the work injury. In her deposition, Dr. McWilliams testified that the claimant’s foot injury resolved; she did not expect it to return and if it did, she opined that it would not be related to her 2001 injury.
 

 In late 2004, the claimant began seeking medical treatment for her foot again. When she saw Dr. Timothy Talbert at Minden Orthopaedics in November 2004, he assessed her as having peroneal tendonitis and calcaneal ossification. He placed her in a short leg walking cast.
 

 In November 2006, she saw Dr. Bryan Randolph, a podiatrist. His impression was “Achilles tendinitis vs peroneal tendonitis right.”
 

 The claimant saw Dr. Steven Atchison in April 2007. The medical records from her visit indicate that she told him that her injury happened in | in2001, she recovered, and then she had recurrences in 2005 and in November 2006. The doctor noted that an MRI revealed no abnormalities.
 

 Hand injury
 

 At the time of her May 2004 accident, the claimant had been back at work for four or five months performing her regular job.
 

 The claimant was seen by Dr. James Dossey at Willis Knighton’s Work Kare on June 9, 2004. She was diagnosed with de Quervain’s tenosynovitis of the right wrist. She did not relate this condition to any specific incident; however, she indicated that she had used her thumb to click her computer mouse and she believed that to be a possible cause of her malady. By July 9, 2004, the doctor found her condition to be improving. As of July 23, 2004, he found that her de Quervain appeared to have resolved, and stated that he had nothing more to offer her. She had some residual hand pain and stiffness, which he suspected was mostly due to degenerative joint problems or hand arthritis. However, he noted that she believed that she should be taken off work.
 

 On August 16, 2004, the claimant went to see Dr. Michelle Ritter at the Center for Hand and Reconstructive Surgery. Dr. Ritter noted intrinsic tightness in the ring, middle and index fingers of the claimant’s right hand and tendinitis of the right thumb. On August 19, 2004, the claimant saw Dr. M.E. Milstead at Orthopedic Specialists of Louisiana. She gave a history of injuring her right hand and thumb when she lost her balance and her buggy pulled her arm. He found that she had de Quer-vain’s tendinitis and multiple trigger fingers; he saw the claimant several more times over the |nnext few months. On November 11, 2004, he diagnosed locked trigger thumb, which he felt was probably related to her diabetes.
 

 When Dr. Ritter saw her on November 18, 2004, she diagnosed the claimant as having de Quervain’s syndrome of the right wrist and forearm, as well as finger flexor tendinitis of the right hand. She also noted that she was unaware that the claimant was being treated by Dr. Mil-stead and suggested that the claimant follow up with him. In early 2005, the claimant was seen by Dr. Milstead again, who opined that she might be displaying early signs of carpal tunnel syndrome.
 

 In March 2005, the claimant was seen by Dr. David Adams of the Spine Institute of Louisiana. To him she gave a history of a jerking traction injury to both hands and wrists. EMG results showed mild bilater
 
 *208
 
 al carpal tunnel syndrome, but no evidence of radiculopathy or ulnar neuropathy.
 

 In May 2005, a second medical opinion was obtained from Dr. Karl Bilderback. He found no objective evidence of a significant injury or of permanent impairment. He believed that Dr. Milstead’s treatments might have resolved any problems she had had. In his opinion, she was not a surgical candidate. Dr. Bilderback opined that she was at MMI and could return to work at her prior occupation.
 

 In August 2005, Dr. Douglas Brown, an orthopedist, performed an independent medical examination (IME) on the claimant. She gave him a history of holding the “airborne” buggy first with her right hand, then her left hand, then her right one again. His impression was that she had osteoarthritis in both hands in the thumb MP joints with early diabetic | ^peripheral neuropathy and early carpal tunnel syndrome. He also diagnosed resolved de Quervain’s syndrome (which he described as tendinitis on back of both wrists) and resolved trigger fingers. He stated in his report that he saw no work-related injuries or percentages of disability related to injury. He opined that she was fully capable of performing the job of computer photographer. Following the results of the IME, the claimant’s indemnity payments were stopped in September 2005.
 

 In his deposition, Dr. Brown noted the claimant’s history of diabetes and explained that diabetes is well associated with peripheral neuropathy. He thought she had early diabetic peripheral neuropa-thy. He stated that he found no objective signs of injury from the 2004 accident and he saw no reason she could not return to work. Although she had early carpal tunnel symptoms, he did not believe the carpal tunnel was related to a work injury. In his opinion, there was no more medical treatment necessary for her work-related injuries.
 

 The claimant continued to see Dr. Mil-stead. In late 2005, he ordered a complete rheumatoid survey. In February 2006, the LSUMC Rheumatology clinic found signs of osteoarthritis with no rheumatoid arthritis. In May 2006, nerve conduction velocity (NCV) studies showed mild median and ulnar neuropathic abnormalities on the right side.
 

 In March 2006, Dr. Milstead wrote a letter stating that her work injury did not cause her existing problems but aggravated them and made the conditions more symptomatic. In June 2006, he noted that she was “really doing fairly well.” Her hands were not bothering her too much and | ]Sthe EMG studies showed only mild levels. EMG studies in April 2007 were essentially unchanged from the one from March 2005. At her May 2007 appointment, Dr. Milstead found that the claimant still had carpal tunnel syndrome.
 

 DISCUSSION
 

 It is not entirely clear what sort of workers’ compensation benefits this
 
 pro se
 
 claimant is seeking. However, it is obvious that she failed to prove entitlement to any additional benefits under any standard of proof, be it by a preponderance of the evidence or by clear and convincing evidence.
 

 As to the 2001 foot injury, the claimant’s medical records and the deposition of Dr. McWilliams demonstrate that the claimant suffered an injury which was appropriately treated and thereafter completely resolved. Dr. McWilliams, who treated the claimant for almost a year, testified that by July 2003, the claimant was at MMI and completely released her from care due to her work injury. She also opined that the condition would not return and, if it did, such a recurrence
 
 *209
 
 would not be related to her 2001 work injury. While the claimant had apparently had subsequent issues with her foot, there is no credible medical evidence in this record to support a finding that these are related in any way to the 2001 injury.
 

 As pertains to the 2004 right hand injury,
 
 [3]
 
 the medical records and the deposition of Dr. Brown show again that the claimant suffered an injury |14which was treated and then resolved. The claimant relied heavily upon the medical records of Dr. Milstead which indicated that the accident might have aggravated her diabetes-related conditions of carpal tunnel syndrome and trigger fingers. On the other hand, the employer emphasized the medical records of Dr. Bilderback, who gave a second opinion on the claimant’s condition in May 2005. At that time, he found no objective evidence of significant injury or permanent impairment; he believed that Dr. Milstead’s treatments had resolved any injury she had had. In his opinion, the claimant was at MMI and able to return to her job. Likewise, in August 2005, Dr. Brown performed an IME on the claimant and reached similar conclusions. Dr. Brown testified in his deposition that he found only preexisting conditions and no objective evidence of work-related injuries. He also saw no reason why she could not return to work.
 

 Presented with two permissible views of the medical evidence, the WCJ chose to accept the view set forth by Dr. Brown, the doctor who performed the IME — an objective party whose opinion was corroborated by Dr. Bilderback — over that of a treating physician, Dr. Milstead. Under the facts of this case, that choice was wholly reasonable. We further find that the WCJ’s conclusion that the claimant’s testimony lacked credibility and failed to help her case is well supported by the record. We cannot say that the WCJ was manifestly erroneous in finding that the claimant was not entitled to any further indemnity or medical benefits as a result of either the 2001 door accident which injured her right foot or the 2004 cart accident in which she hurt her right hand.
 

 ^CONCLUSION
 

 We affirm the judgment of the WCJ in favor of the defendant, Olan Mills. Costs of this appeal are assessed to the plaintiff, Judith Frye.
 

 AFFIRMED.
 

 [1]
 

 . While the copy of this claim form found in the record is difficult to read, it appears to assert that she injured her “RUE." Her answers to interrogatories state that she hurt her “right upper extremity."
 

 [2]
 

 . When Dr. Sewell saw her in December 2003, the doctor noted that the claimant had chronic foot pain, thought to be neuropathy, and that she had been seen by a neurologist, Dr. Mary McWilliams. In her testimony, the claimant disagreed with Dr. Sewell’s finding that she had a foot disease; she believed that she would have it in both feet and legs if she was so afflicted. Likewise, she disputed the doctors’ findings that she had neuropathy because she believed that she would have to have it in both heels.
 

 [3]
 

 . On the issue of whether the claimant injured only her right hand or both hands, we note that all of the claimant’s initial complaints to her doctors mentioned only her right hand. She made no mention of any injury to her left hand to Drs. Dossey, Ritter or Milstead. Only in March 2005, almost a year after the accident, did she first claim to Dr. Adams that she hurt both hands. At best, her trial testimony on the subject was contradictory and confusing. In one breath she admitted that she did not hurt her left hand; in the next, she claimed to have injured both hands.